Donald L. BLACK, Plaintiff–Appellant (92–5611), Plaintiff–Appellee (92–5694),

v.

RYDER/P.I.E. NATIONWIDE, INC.; Teamsters Local No. 519; Joint Council No. 87 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America; Southern Conference of Teamsters, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Defendants–Appellees (92–5611),

Teamsters Local No. 519, Defendant–Appellant (92–5694).

Nos. 92–5611, 92–5694.

United States Court of Appeals, Sixth Circuit.

Argued June 28, 1993.

Decided Feb. 2, 1994.

Paul A. Levy, Public Citizen Litigation Group, Washington, DC, Peter Alliman (argued and briefed), Lee, Alliman & Carson, Madisonville, TN, Arthur L. Fox, II (briefed), Kator, Scott & Heller, Washington, DC, for Donald L. Black in Nos. 92–5694 and 92–5611.

Cecil D. Branstetter (briefed), Jane B. Stranch (argued and briefed), Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, for Teamsters Local #519 in Nos. 92–5694 and 92–5611.

Howard H. Vogel, O'Neil, Parker & Williamson, Knoxville, TN, Peter Reed Corbin, Corbin & Dickinson, Jacksonville, FL, John Paul Jones, Clearwater, FL, for Ryder/P.I.E. Nationwide, Inc. in No. 92–5611.

Cecil D. Branstetter, Jane B. Stranch, Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, for Joint Council # 87 of the Intern. Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America in No. 92–5611.

G. William Baab, Mullinax, Wells, Baab & Cloutman, Dallas, TX, for Southern Conference of Teamsters, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America in No. 92–5611.

Before: RYAN and BOGGS, Circuit Judges; and ROSEN, District Judge.[*]

RYAN, Circuit Judge.

■ The plaintiff, Donald L. Black, sued Ryder/P.I.E. Nationwide, Inc. and Teamsters Local No. 519 in 1985, alleging a hybrid section 301 [1] claim.[2] The district court originally dismissed this claim, following a nonjury trial, pursuant to Fed.R.Civ.P. 41(b). This court reversed and remanded for a jury trial, *Black v. Ryder/P.I.E. Nationwide, Inc.,* 930 F.2d 505 (6th Cir.1991), and in February 1992, a jury returned a verdict in favor of the plaintiff, awarding compensatory damages, emotional distress damages, and attorney fees against Local 519.[3] The district court, however, vacated the emotional distress part of the damage award, on the grounds that the award was duplicative of damages already received by the plaintiff in a separate action under 29 U.S.C. § 411(a)(2). Black appeals from that order, arguing that the district court's conclusion that the damages

were duplicative is clearly erroneous. For the reasons discussed below, we agree, and therefore reverse the district court's order.

Local 519 also cross-appeals from the district court's denial of its motion for judgment as a matter of law. It argues, first, that the district court erred in finding that the evidence was sufficient to support the conclusion that the union had breached its duty of fair representation to the plaintiff; and second, that the district court abused its discretion in excluding evidence of an NLRB decision not to issue a complaint on Black's charges against the union. We reject these arguments, and affirm the district court's judgment.

**I.**

Black's section 301 claim arises out of his termination by Ryder for his alleged failure to report an accident, and Local 519's alleged dereliction of its duty to represent him in the subsequent grievance proceedings.

In November 1984, Black drove a loaded truck from Knoxville, Tennessee, to Birmingham, Alabama. At that time, Black had worked for Ryder for almost twenty years. Driving in a convoy with Black on this trip, and never more than half a mile away from him, were two other drivers. During the trip, the three passed each other periodically, and verified that the trucks' turn signals were operating at all times. The three arrived at the Birmingham terminal within mo-

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, permits suits against labor organizations:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ..., or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). In a hybrid suit brought under this section, an employee must show both that the employer breached the collective bargaining agreement, and that the union breached its duty of fair representation.

[2] Black also alleged a section 411 claim against Local 519 and Teamsters Joint Council 87. Section 101 of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 411, also known as the Bill of Rights, guarantees, *inter alia,* that union members shall have equal rights within the organization, and shall have the right to meet with other members and freely express their views about the union. The district court, without objection, severed the section 301 and section 411 claims, because it erroneously believed that the section 301 claim could not be tried before a jury. As discussed more fully below, Black's section 411 claim resulted in a general jury verdict in his favor.

[3] Because Ryder declared bankruptcy, it was not involved in the second trial.

ments of each other, at approximately 5:00 a.m., and parked their trucks in the fuel lane, about 250 to 300 feet from the shop garage, to await servicing. Neither Black nor the other drivers noticed any damage to Black's truck at that time, nor had they noticed an accident on the trip that could have led to any damage. The three drivers turned in their paperwork at the dispatch office, and then proceeded to perform a pre-trip inspection on the different trucks that they had been assigned to take back to Knoxville. While doing this, Black and another driver noticed that the truck Black had driven from Knoxville was being moved between the fuel line and the tire shop by a yard hostler.[4] Black commented to his companions, "[B]oy, they must have sure needed my load quick because they just pulled my truck off and are taking it around." This occurred at approximately 5:30 a.m.

Black and his companions then embarked on the return trip to Knoxville. Some thirteen hours after his arrival in Knoxville, Black was informed that the truck he had driven to Birmingham had been discovered to have approximately $300 worth of damage. A vehicle repair order prepared by the shop foreman at the Birmingham terminal, and signed by the mechanic, reported the following:

> Unit came in with damage on L. front. L. turn signal and marker light knocked off. Area around unit inspected and no broken lenses or fiberglass around unit.

Because Black had turned in the truck without reporting any damage, the company informed him that he would be suspended.[5] Several days thereafter, Ryder dismissed him.

Black approached Jimmy Metts, the business agent of the union, because according to the union's bylaws, the business agent had sole responsibility for representing union members in grievance proceedings. The business agent also had the duty of investigating a discharge case. At the core of Black's claim in this case is his contention that Metts, as the union representative, deliberately did an inadequate job of representing him.[6]

Metts and Black have an acrimonious history, of which much evidence was introduced at trial in this case. Black, who had consistently been a strong union supporter, became, in the early 1980s, an active leader in a dissident group that was a political threat to those holding power in the union, including Metts. The dissident group consisted of union members who were disillusioned by what they viewed as corruption on the part of the union president who had been elected in 1980. Black's active participation in the group put him in conflict with the local and national Teamster leadership. As animosity toward the president and his associates grew within the Local, Black let it be known in July 1984 that he was going to challenge the president in the next election.[7]

The dissension within Local 519 reached its apex in the establishment of a picket line around the local union hall in the summer of 1984. On the first morning of the picket, Metts was the first union official to come to work. As Metts drove up, several picketers, including Black, approached his car, and told him that he was part of the problem in the local union. Metts left immediately and no other official returned to the hall that day.

Local 519 officers filed a complaint against the picketers, and the Tennessee Chancery Court issued a restraining order requiring the picketers to leave the union hall. The Executive Board of Local 519 brought charges against Black and the other protestors for their conduct during the four days of picketing. At a hearing before the next higher Teamster body, Joint Council 87,

---

4. A hostler is someone whose job is to move trucks inside the terminal.

5. Failing to report an accident is a violation of the collective bargaining agreement for which the penalty is discharge.

6. Metts was unavailable to testify at trial because of a serious stroke.

7. Black was ineligible to run, however, because of an error in the payment of his union dues. Another union member from the dissident group was selected, and that man defeated the incumbent, taking control of the approximately 2100–member union.

Black and the other picketers were convicted and suspended from the union for six months and fined $150 each.[8] In addition, according to Black, the local officials took retaliatory action against him by deliberately referring him to a job that involved heavy physical labor, and where Black ultimately injured his back and was forced to remain out of work for some time.[9]

Black's subsequent section 411 claim, which derived from these incidents, was tried in June 1990. In a general verdict, the jury found in favor of the plaintiff, and the court entered judgment against Local 519 in the amount of $30,000 in compensatory damages and $10,000 in punitive damages.[10]

In sum, there was ample evidence at trial that would allow the jury to conclude there was substantial animosity between Black and the union generally, as well as Metts specifically.[11] According to Black, it was this animosity that led Metts to refuse to take the one step that would have been favorably dispositive of Black's case: going to Birmingham and interviewing the mechanic who fixed the truck, and who signed the damage report. When Black specifically asked Metts to go to Birmingham in order to be properly prepared for Black's grievance hearing, Metts told Black that "he wasn't going to Birmingham, said he didn't have time in the first place and said he couldn't find nothing out down there." Black acknowledges, nonetheless, that Metts did produce at the grievance hearing a number of statements from witnesses, specifically, the drivers who had accompanied Black to Birmingham. Black,

however, either pre-prepared all those statements, or physically brought the witnesses to Metts for the purpose of preparing a statement. According to Black, Metts "wasn't asking for nobody to give no statement."

Black's grievance was heard by a joint committee, and both Black and Metts were present at the hearing. Ryder called no witnesses at the grievance committee hearing, but introduced various documents, including the vehicle repair order prepared by the Birmingham mechanic, as well as relevant correspondence, a diagram of the service aisle at the terminal, photographs of the damaged truck, and documents relating to the repairs. Ryder did not call Everett Alderson, the mechanic who discovered the damage to the truck, nor did it present any statement made by Alderson.

The theory of the case presented by Metts was that the truck was in working condition when Black left Knoxville; that there was no accident during the trip; that the truck was undamaged when Black left it at the terminal; and that the damage must therefore have occurred subsequently. In presenting this theory, Metts read Black's grievance into the record, and introduced the statements gathered from the drivers who had accompanied Black from Knoxville. In addition, pictures of the damaged truck showed it parked in a spot other than the one where Black had left it; Black testified that the truck had, therefore, obviously been moved by a hostler, and the damage must have occurred in that move.

8. Black's fine was subsequently waived and he was reinstated to membership in Local 519 without making payment.

9. Black testified that when he asked about the job before he took it, the union president assured him that it would involve no heavy labor.

10. The jury also rendered a verdict against Joint Council 87 in the amount of $20,000 in compensatory damages and $5,000 in punitive damages. On appeal, this court affirmed the verdict against Local 519 but reversed that against Joint Council 87. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461 (6th Cir.1992).

11. There was, moreover, testimony from various witnesses that Metts had made his dislike of

Black explicit. John Walker, another union member, testified:

> So I went over and talked to Mr. Metts personally.... I said Don Black looks like a good union man, he would make a good steward, and he said, no, he is a troublemaker, nobody likes him, don't have any friends in the union. He said someday Donald Black will get in trouble and we won't have any trouble. And Ernest Parrott testified that one union official, in Metts's presence, described Black as "a member that's trying to tear the Local up." Parrott then testified: "About that time Mr. Metts said him and Don had been talking and he said, well, that no good rascal hung up on me and Burt Creesey said we need to get rid of him and Metts looked up at him and started grinning and shaking his head."

· At the trial below, Everett Alderson testified as to what he would have said had he been called as a witness at Black's grievance hearing, or had Metts taken his statement. Alderson first saw Black's truck some two hours after Black had parked it—and when he saw it, it was some ten to twelve feet from the shop garage, rather than the 250 to 300 feet from the garage where Black had parked it. As a result, Alderson testified, he had no knowledge of the condition Black's truck was in when it came into the terminal:

> Q If someone from the Knoxville Local had come down to investigate the accident and had asked you did you see Donald Black's truck come into the Birmingham terminal with damage, how would you have answered?
>
> A I couldn't have answered because I didn't see him come in.

Moreover, Alderson agreed that it was possible that a hostler had damaged Black's truck:

> Q If someone from the Knoxville Local had come down to interview you and ask you and said don't hostlers often remove trucks from the ready line where you're getting ready to pull them in and unhook pups when they're going to different cities and bring them back to the ready line, how would you have answered?
>
> A Yes, I did.
>
> Q If someone from the Knoxville Local had come down to investigate this accident and asked you, Mr. Halderson [sic], do you know for a fact whether or not a hostler may have picked this truck up out of your ready line and damaged it and brought it back, how would you have answered?
>
> A That's possible.

Alderson's testimony, then, would have significantly undercut the impact of his written accident report—prepared not by him, but by his supervisor—which said that Black's "[u]nit *came in*" with damage.

At trial, David Chaney, the Ryder representative who had handled Black's grievance

for the company, admitted that testimony like that of Alderson would have made him less inclined to conclude that Black had damaged the truck: [12]

> Q Well, I am just asking you, Mr. Chaney, if in fact it had been misrepresented to you what Mr. Alderson was actually saying and Mr. Alderson was not saying that Mr. Black brought the truck in with damage, would that have changed your decision?
>
> A If I knew that he was lying, yes, it would.
>
> . . . .
>
> Q ... If Mr. Metts had come to you and said, look here, Mr. Chaney, I've got some facts that indicate that your reports are wrong and that Mr. Alderson or none of the others who were involved in this vehicle repair report say that they don't really know whether the vehicle came in with damage or whether it was damaged on the terminal, would that have changed your decision first?
>
> A That would have influenced it, yes. I would have reconsidered it.

The grievance committee decided the case in favor of Ryder. Black then sued Ryder and the union under section 301. At trial, the jury returned a verdict in favor of Black, awarding $56,408.08 in compensatory damages, $153,000.00 for emotional distress, and attorney fees against Local 519. As discussed in more detail below, the district court vacated the award for emotional distress, and the plaintiff timely appealed. In addition, the district court denied the defendant's motion for a new trial, and Local 519 filed a timely appeal from that decision.

## II.

### A. Emotional Distress Award

Prior to trial, Local 519 filed a motion *in limine* in which it asked the court "to bar the

---

12. Chaney's testimony also produced some evidence that Ryder was hostile to employees who, like Black, filed many grievances:

> Q [Y]ou knew that Don Black, didn't you, was a person who had filed a lot of grievances on behalf of himself and others against·Ryder?
>
> A Don has filed some grievances, yes.
>
> Q Is that something that management likes or dislikes from an employee?
>
> A I would say management dislikes it.

admission of any testimonial or documentary evidence concerning a claim for mental distress damages. Plaintiff has full [sic] litigated his claim for mental distress damages in the previous § 411 trial." The court reserved ruling on the motion, but warned the parties at trial that "[y]ou can't recover twice for the same injury even though you've got two violations, alleged violations of the law, one of which you have already recovered on for mental anguish...." The court indicated that it would "submit this question to the jury," only because the previously litigated section 411 claim was on appeal, thus making it uncertain whether Black would in fact ever recover the damages awarded in that case. In submitting the section 301 case to the jury, the court used a special verdict form to enable separation of the damages, and then vacated the jury's award of $153,000.00 in damages for emotional distress, concluding that "such damages would be duplicative" in light of the damages awarded in the earlier section 411 case.[13] The court reasoned as follows:

> At the ... § 411 trial and the recently held § 301 trial, the plaintiff relied upon the same medical proof by deposition. That proof was to the effect that plaintiff had suffered significant mental injury as a result of his "troubles with the union." ... The only fair reading of plaintiff's medical proof was that both his suspension from the union and his termination from his work substantially contributed to a subsequent mental breakdown.... [The] plaintiff suffered a single, indivisible injury as a result of two different acts which have been attributed to the defendant.... [I]t is clear that the $30,000.00 in compensatory damages was the jury's award based upon the mental distress damages suffered by the plaintiff beginning in the summer of 1984.... [P]laintiff would have fully recovered for his mental injury in the § 411 case.

Black now argues that in reaching this decision, the district court improperly speculated on the jury's basis for awarding damages in the general verdict given in the sec-

tion 411 case, and that the court had no sound reason for concluding that the damages must have been for emotional distress.

In response, the defendant argues only that the decision to vacate the award may be supported by the doctrine of *res judicata.* It argues that the judgment in the section 411 claim established the plaintiff's entitlement to damages for mental distress and the amount thereof, and that neither issue should have been relitigated in the subsequent section 301 action. The two suits, the defendant argues, were meant to remedy a single wrong, which was damage to a plaintiff's mental state.

Thus, the parties' arguments ask us to consider two possible bases for vacating the jury's damage award: duplication of damages and the doctrine of claim preclusion. We shall first consider duplication of damages.

This court has not addressed the question of the appropriate standard of review of a district court's vacating of damages on the grounds of duplicative recovery. We conclude that the question whether damage awards are duplicative is one of fact, and we will therefore review the district court's determination for clear error. *See U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1259 n. 53 (10th Cir.1988); *see also Reilly v. United States,* 863 F.2d 149, 165 (1st Cir. 1988); *Bartholomew v. Universe Tankships, Inc.,* 279 F.2d 911, 918 (2d Cir.1960). " '[T]he burden is on the one claiming duplication to show that the damages assessed against it have in fact and in actuality been previously covered.' " *U.S. Indus.,* 854 F.2d at 1260 (quoting *Wood v. Diamond M Drilling Co.,* 691 F.2d 1165, 1171 (5th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983)).

In *U.S. Industries,* the defendants objected to a jury award of $550,000 on a federal securities law claim and $614,000 on a fiduciary duty claim, arguing that the awards were partially duplicative. The district court agreed, and set forth five case-specific fac-

---

**13.** The court explained that it had allowed the damage evidence and submitted the question to the jury "only to avoid retrying this case in the event that I am wrong regarding the recoverability of damages for mental distress in this action."

tors that led it to conclude that the awards were in fact duplicative. The court of appeals affirmed, reasoning as follows:

> While a plaintiff "is entitled to proceed on various theories of recovery, the theories must be pursued with caution [to avoid duplication]." ... If [two] claim[s] arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery.... Where a jury award duplicates damages, "the court should ... reduce the judgment by the amount of [the duplication], and thereby prevent double recovery."

*Id.* at 1259–60 (citations omitted). Underlying the court's conclusion was the common wisdom that " 'an injured party may recover damages only for the actual loss he suffered and no more; he is to be made whole, but not entitled to be put in a better condition than he would be in had the wrong not been committed.' " *Id.* at 1259 n. 54 (citation omitted). In concluding that the factors enumerated by the district court were a sufficient basis for finding the awards duplicative, the Tenth Circuit noted that a single transaction served as the sole basis for both the federal and the state claim articulated by the plaintiff. It affirmed, determining that "while the damages that could be awarded were not necessarily identical for the two claims, the trial judge's finding on duplication is not clearly erroneous." *Id.* at 1260 (footnote omitted).

In the trial on Black's section 411 claim, the district court instructed the jury in relevant part as follows regarding damages:[14]

> These damages, if any, are what the law calls compensatory damages, are not restricted to actual loss of time or money. They cover both the mental and physical aspects of injury, tangible and intangible....
>
> ....
>
> [Y]ou may consider that [sic] any emotional distress, humiliation or public embarrassment accompanied by physical injury.

Secondly, you may consider any lost earnings or other economic loss.

> ....

If you find for the Plaintiff and you find that he was physically injured, as a proximate result of the actions of Defendant, or any of them, you may compensate him for any aggravation of any existing disease or physical defect resulting from such injury....

> ....

If your verdict is for the Plaintiff, it should include a reasonable value or expense of any hospitalization, any medical care and treatment necessary or reasonably obtained by the Plaintiff in the past and to be so obtained in the future, if you find that the Plaintiff was physically injured or suffered emotional distress accompanied by physical injury....

If you find after having considered the evidence presented that the Defendants violated the Plaintiff's rights, but that the Plaintiff suffered no real injury, as a result of these violations, you may award the Plaintiff nominal damages.

As these instructions reveal, the jury in the section 411 action had multiple bases available to it for awarding damages to Black. In addition to compensating the plaintiff for his mental distress, the jury was instructed that it could consider "actual loss of time or money"; "physical aspects of injury"; "lost earnings or other economic loss"; "aggravation of any existing disease or physical defect resulting from [physical] injury"; as well as the expense of medical care relating to the physical, not merely the mental, aspect of his injury. In examining the jury's resulting general verdict, there is no hint as to which of those bases for recovery motivated the damage award.

In making its finding of duplication, the district court apparently overlooked the many alternative grounds for damages on which it had instructed the jury. For the district court to have concluded that the awards were duplicative required it to engage in pure speculation regarding the basis

---

**14.** Local 519 has not suggested that the instructions given by the district court in the section 411 claim were erroneous.

for the general verdict in the earlier case. The record provides no verifiable corroboration for the court's inference that there was only one plausible basis for the verdict. This, together with the court's failure to explain why it concluded that the other grounds were not relied on, renders clearly erroneous the court's decision that the mental distress damages were duplicative of the general verdict rendered in the section 411 claim. We note, moreover, that unlike *U.S. Industries,* this case presents two claims that arose from different operative facts, and for which the plaintiff requested different relief.

■ We now turn to the defendant's argument that the issue of damages for mental distress was rendered *res judicata* by the jury verdict in the section 411 case. This court reviews *de novo* a district court's decision with regard to claim or issue preclusion. *See Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 918 F.2d 658, 660 (6th Cir.1990). The doctrine of claim preclusion, sometimes referred to as *res judicata,* mandates that if an action results in a judgment on the merits, that judgment operates as an absolute bar to any subsequent action on the same cause between the same parties, with respect both to every matter that was actually litigated in the first case, as well as to every ground of recovery that might have been presented. *Action Distrib. Co. v. International Bhd. of Teamsters Local 1038,* 977 F.2d 1021, 1026 (6th Cir.1992). In contrast, issue preclusion, or collateral estoppel, dictates that once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving any party to the prior litigation. *Id.*

■ The defendant did not raise its *res judicata* theory in its motion *in limine* to the district court, and the district court did not rely on it in choosing to strike the damage award. It is this court's general rule that we will not consider arguments raised for the first time on appeal. *See Federal Deposit Ins. Corp. v. Binion,* 953 F.2d 1013, 1018 (6th Cir.1991). However, this court has held that

"not every failure to plead res judicata ... will result in a waiver...." *Lesher v. Lavrich,* 784 F.2d 193, 196 (6th Cir.1986). Assuming, without deciding, that the defendant has not waived this argument, we will dispose of it on its merits.[15]

■ Black's "injury" for which he filed suit was not, as the defendant claims, the damage to his mental state. Black's mental distress is an element of compensable damages, but there were two separate "injuries" on which he sued Local 519: one, under section 301, for the breach of the union's duty to fairly represent him; and two, for the violation of the rights guaranteed him under section 411. The two claims were not simply two separate grounds of recovery, but instead stemmed from entirely separate and discrete events and wrongful acts by the union. Thus, it is readily apparent that an argument of claim preclusion is inapposite, because the subsequent section 301 action was not an action on the same cause as the prior section 411 action. Issue preclusion is likewise unhelpful to Local 519, because the issue of Black's mental distress was *not* necessarily determined by the jury in the earlier section 411 claim. It is apparent that the section 411 jury may have believed that Black suffered mental distress, but concluded that it could not have been the union's violations of section 411 that caused the distress.

In short, we conclude that the district court erred in vacating the emotional distress aspect of the jury's damage award.

### B. Sufficiency of the Evidence

The district court denied Local 519's motion for judgment as a matter of law, rejecting the defendant's argument that Black did not present sufficient evidence on which the jury could have found a violation of the duty of fair representation. The court concluded that there was sufficient evidence "upon which a reasonable jury could believe that [Local 519's] conduct was outside a wide range of reasonableness so as to be irrational." It specifically pointed to the plaintiff's proof that "in representing the plaintiff, the Union's agent, Mr. Metz [sic], neither went

15. The parties did not address the waiver question in their briefs.

to the Birmingham terminal to investigate the site of the incident nor talked to any of the witnesses, particularly the mechanic who found the alleged damage to the truck." This evidence, the court reasoned, allowed the jury to reasonably conclude both that the "union did not carry out its duty to fairly represent the plaintiff" because its investigation was "irrational," and that "the union's inadequate investigation so seriously flawed the grievance process that an erroneous decision was reached to terminate the plaintiff." The court further found that, because of the testimony that Black was not involved in an accident, there was sufficient evidence that "Ryder P.I.E. did not have just cause for discharging plaintiff."

In this court, Local 519 primarily argues that the facts are insufficient to show that it breached its duty of fair representation to the plaintiff. It contends that the most the plaintiff can show is that Metts did not interview the mechanic who discovered the damage to the truck; because Metts otherwise processed the claim, however, it cannot be said that his behavior was grossly negligent or arbitrary.[16] Finally, the Local argues, the plaintiff did not show that interviewing the mechanic would have altered the outcome of Black's grievance case, nor did the plaintiff show that Ryder breached the collective bargaining agreement by discharging Black without good cause.

Black argues that he presented a great deal of evidence that could have led the jury to conclude that the grievance proceeding against Black was the result of collusion between the Teamsters and management—that is, that the union informed management that it wished to rid itself of a troublesome member, and that management obliged. He further argues that the Local knew that Ryder's primary evidence against him would be the

written report of the mechanic who examined the damaged truck, and that, therefore, to neglect to interview that mechanic amounted to irrational behavior on the part of the Local. Black contends that the mechanic's testimony at trial demonstrated that Alderson would have been a pivotal witness in the grievance process.

■ Motions for judgment as a matter of law are governed by recently amended Fed. R.Civ.P. 50(b). The standard of review that was applicable to the forerunner to this motion, the motion for judgment notwithstanding the verdict, also applies to motions under the new rule. Thus, this court reviews a motion for judgment as a matter of law using the same standard used by the district court. *See Marsh v. Arn,* 937 F.2d 1056, 1060 (6th Cir.1991). The court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. *See Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.,* 869 F.2d 264, 268 (6th Cir.1989).

A hybrid section 301 action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union. *See DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 162, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983). " '[T]he two claims are inextricably interdependent.' " *Id.* at 164, 103 S.Ct. at 2290 (citation omitted). As such, "to recover against either the Company or the Union, [the plaintiff] must show that the Company breached the [Collective Bargaining] Agreement and that the Union breached its duty of fair representation." *Bagsby v. Lewis Bros.,*

---

**16.** In this regard, Local 519 contends that had Alderson testified, his testimony would have been both harmful and helpful to Black, and that it was therefore reasonable for the Local to choose not to call him. We note, first, that this is at best a *post hoc* rationalization; the union failed to interview Alderson prior to the grievance hearing, and thus the union had no idea whether Alderson's testimony would have been helpful, harmful, or anything in between. *Cf. Brown v. International Bhd. of Elec. Workers Local Union*

*No. 58,* 936 F.2d 251, 255 (6th Cir.1991). Second, we think this argument gives too much emphasis to Alderson's testimony that he did not see the truck go through his service aisle, which the union contends demonstrates that Black's truck was not moved by a hostler. Alderson's testimony on this score was vague and imprecise, and his failure to specifically refer to any time frame would prohibit any reasonable trier of fact from drawing the conclusion advanced by the union.

820 F.2d 799, 801 (6th Cir.1987) (emphasis removed). Indeed, "the case [an employee] must prove is the same whether he sues one, the other, or both." *DelCostello,* 462 U.S. at 165, 103 S.Ct. at 2291.

■■■ Actions for a union's breach of its duty of fair representation depend for their rationale on the union's otherwise-complete control over the handling of an employee's grievance. "Just as ... fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 75, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991).

> [A]n employee harboring a complaint against his employer that he has been wrongfully discharged in violation of the collective bargaining agreement is required to attempt to exhaust the grievance remedies provided for in the agreement.... Subject to very limited judicial review, the employee will be bound by the result.... The Supreme Court has recognized, however, that "this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation."

*Sparks v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.,* 980 F.2d 394, 397–98 (6th Cir. 1992) (quoting *DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290). In the words of the seminal case on this doctrine, the duty of fair representation requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and hon-

esty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).

The exact breadth of the union's duty of fair representation has been given content in a number of cases. As the language of *Vaca* implies, and as the Supreme Court recently explained in *O'Neill,* the standard is a "tripartite" one, such that "a union breaches its duty of fair representation if its actions are *either* 'arbitrary, discriminatory, *or* in bad faith.'" *O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1129 (emphasis added).[17] Thus, the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty. In other words, a plaintiff need only show that the union's actions could be characterized in any one of these three ways. *See, e.g., Brown v. International Bhd. of Elec. Workers Local Union No. 58,* 936 F.2d 251, 255 (6th Cir. 1991).

■■■ Judging whether a union has acted discriminatorily or in bad faith ordinarily presents a simple and straightforward issue. But with respect to an allegation of arbitrariness, the issue is more complex: mere negligence or poor judgment on the part of the union will not support a claim of unfair representation. *Walk v. P*I*E Nationwide, Inc.,* 958 F.2d 1323, 1326 (6th Cir.1992). As the Supreme Court has made abundantly clear, a plaintiff will not succeed if he can show only slightly unreasonable behavior on the part of the union, because "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' ... as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1129 (citation omitted).[18] A un-

---

**17.** Although *O'Neill* framed its standards for breach of the duty of fair representation in the context of a dispute over the union's performance in contract negotiations, this court has explicitly held that *O'Neill*'s standards govern a union's conduct in contract administration and enforcement as well. *Walk v. P*I*E Nationwide, Inc.,* 958 F.2d 1323, 1326 (6th Cir.1992). This intention was, moreover, made clear in *dicta* in *O'Neill* itself: "[N]one of our opinions has suggested that the duty is governed by a double standard. Indeed, we have repeatedly noted that the *Vaca v. Sipes* standard applies to 'challenges

leveled not only at a union's contract administration and enforcement efforts but at its negotiation activities as well.'" *O'Neill,* 499 U.S. at 77, 111 S.Ct. at 1135 (citation omitted).

**18.** It is worth clarifying that this language refers only to the arbitrary, or reasonable, prong of the tripartite standard; if a plaintiff shows that a union acted in bad faith or discriminatorily, he does not also need to show that the bad faith or discrimination was "outside a wide range of reasonableness." *See, e.g., Ackley v. Local Union 337, Int'l Bhd. of Teamsters,* 948 F.2d 267, 267

ion must nonetheless undertake reasonable investigation to defend a member from employer discipline. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). A union does not, however, have to exhaust every possible remedy requested by a member facing disciplinary action. *St. Clair v. International Bhd. of Teamsters Local Union No. 515,* 422 F.2d 128, 130 (6th Cir.1969). In short, the "relevant issue in assessing a Union's judgment is not whether it acted incorrectly, but whether it acted in bad faith," or extremely arbitrarily, or discriminatorily. *Anderson v. Ideal Basic Indus.,* 804 F.2d 950, 953 (6th Cir. 1986).

 To recapitulate, then, in order to succeed on his hybrid section 301 claim, Black needed to show (1) that the union breached its duty of fair representation in the handling of his grievance, either through discrimination, bad faith, or extreme arbitrariness, and (2) that Ryder breached the collective bargaining agreement by discharging him without good cause. In addition, Black needed to show (3) that the union's breach of its duty tainted the decision of the hearing panel. *See Wood v. International Bhd. of Teamsters Local 406,* 807 F.2d 493, 500 (6th Cir.1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). The impact of the breach on the outcome must, moreover, have been substantial; to establish a breach of fair representation, the plaintiff must meet the onerous burden of proving that the grievance process was "*seriously flawed* by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines,* 424 U.S. at 570, 96 S.Ct. at 1059 (emphasis added). Thus, if a union fails to present favorable evidence during the grievance process, this failure may constitute a breach of its duty only if that evidence probably would have brought about a different decision. *See Taylor v. Ford Motor Co.,* 866 F.2d 895, 898–99 (6th Cir. 1989).

(6th Cir.1991). As a matter of course, bad faith or discriminatory conduct cannot ever be reasonable.

 Contrary to the contentions of the defendant, there was a real question as to whether the failure to call Alderson violated the union's duty. While in many circumstances the failure to call a particular witness cannot amount to a breach of the union's statutory duty, this is not true of every case. The union here failed to call the one witness who could have effectively and objectively corroborated Black's testimony on a vital matter. It failed, moreover, even to telephone this witness to ascertain whether he could have provided any substantiation of Black's version of the facts. Evidence presented at trial was such as to allow the jury to conclude either that the union's conduct, under the circumstances, was so arbitrary and unreasonable as to be beyond the realm of the rational, or that the union was motivated by bad faith or discriminatory animus against Black, an intra-union rival.

We conclude, moreover, that Alderson's testimony was sufficiently significant that it would likely have altered the results of the grievance proceedings. We are supported in our conclusion on this score by David Chaney, the Ryder representative who explicitly testified that Alderson's testimony would in fact have made him reconsider whether to discharge Black. Alderson's absence could therefore have been found by the jury to have greatly influenced the course of the grievance hearing.

Finally, there was ample evidence that Black did not have an accident, and that he therefore did not fail to report an accident. The jury could thus have found that Ryder breached the collective bargaining agreement by discharging Black without good cause.

The facts we have discussed support the jury's determination that the defendant violated section 301. We therefore uphold the judgment of the district court and the decision of the jury in this case.

### C. Effect of NLRB Decision

Local 519 attempted at trial to admit as exhibits certain documents relating to an NLRB decision involving Black's section 301

claim. The decision was the NLRB's refusal to issue a complaint in response to Black's unfair labor practice charge, involving the same subject matter as this suit. The documents indicated that the NLRB declined to pursue Black's charge because its investigation turned up insufficient evidence to warrant proceeding. Although the district court rejected the Local's attempt, its reasons for doing so do not appear in the record.[19] The Local also argued, in its motion for judgment as a matter of law, that the court should have given collateral estoppel effect to the NLRB decision. The court rejected the defendant's argument on the grounds that the NLRB decision "was not an agency decision made in the agency's judicial capacity after notice and a full and fair hearing."

On appeal, Local 519 makes two arguments: (1) that the NLRB decision should be given preclusive effect in this case, barring Black's section 301 claim, and (2) in the alternative, that the NLRB decision should have been admitted to show the lack of merit in Black's claim. Black argues first that the decision is not entitled to preclusive effect because it was not the end-product of a full adjudicatory proceeding; second, he contends, the NLRB decision was properly excluded from admission because it would have been more prejudicial than probative, as the jury would be likely to give the NLRB extraordinary deference.

▪▪▪ As we have already stated, this court reviews *de novo* a district court's determination of questions of issue or claim preclusion. *See Gargallo,* 918 F.2d at 660. Although this circuit has never directly resolved the issue, other circuits have uniformly rejected the suggestion that an NLRB decision that did not result from an adjudicatory hearing should be given preclusive effect. In *Warehousemen's Union Local No. 206 v. Conti-*

*nental Can Co.,* 821 F.2d 1348 (9th Cir.1987), the court held that " 'the NLRB's refusal to issue a complaint does not act as res judicata ... [and] no collateral estoppel effect attaches to such refusal.' " *Id.* at 1351 (citations omitted). The First Circuit has likewise held that "the Regional Director's refusal to issue a complaint does not collaterally estop the charging party from litigating the matter in a later suit under section 301." *Courier–Citizen Co. v. Boston Electrotypers Union No. 11,* 702 F.2d 273, 277 n. 6 (1st Cir.1983).

The reasoning implicit in certain related Sixth Circuit opinions, moreover, likewise dictates that no preclusion attaches. This court has reasoned that "a factual determination by the NLRB in an action under the NLRA may preclude a federal court, hearing a case under the LMRDA, from considering renewed dispute about that fact." *Olchowik v. Sheet Metal Workers' Int'l Ass'n,* 875 F.2d 555, 557 (6th Cir.1989). The *Olchowik* court, however, then proceeded to conclude that an earlier factual determination by the NLRB did *not* have preclusive effect in its case, because of "the classic test for issue preclusion." *Id.*

That test can be broken down into three steps: 1) is the issue identical to that actually decided by another decisionmaker? 2) was the issue necessary to the earlier judgment? and 3) did the party against whom preclusion would operate have a full and fair opportunity to litigate the issue? *Id.* None of these three steps is satisfied in a case where the NLRB simply refused to issue a complaint after an administrative investigation. Therefore, no preclusive effect should be given to the NLRB documents pointed to by the defendant here.

▪▪▪ The defendant's alternative argument for why the NLRB decision should

---

**19.** The record reflects only the following colloquy:

[LOCAL 519]: ... Your Honor, we would like to make an offer of proof of the documents certified under seal by the National Labor Relations Board and we are requesting, one, that there is, taking Sixth Circuit International Law which indicates that these are collateral [e]stoppel case [sic] and, two, there are other cases.

THE COURT: Received for I.D. only....
....

[LOCAL 519]: Just on that offer of proof, I would like the record to show that have [sic] offered those exhibits for the purpose of being an evidentiary matter before the jury which they can consider and give what weight they deem proper.

have been considered by the jury is governed by the Federal Rules of Evidence. Only relevant evidence may be admitted at trial. Fed.R.Evid. 402. To be relevant, evidence need have some bearing on the probability of "the existence of any fact that is of consequence to the determination of the action." Fed.R.Evid. 401. Federal Rule of Evidence 403 permits relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403. Because the district court has broad discretion to determine matters of relevance, this court reviews for an abuse of discretion that affected the substantial rights of a party. *See Turner v. Allstate Ins. Co.*, 902 F.2d 1208, 1214 (6th Cir.1990); *National Post Office Mailhandlers v. United States Postal Serv.*, 751 F.2d 834, 841 (6th Cir.1985). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the 'evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320–21 (6th Cir.1990) (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir.1988)). While it would be preferable for this court to be able to review the district court's rationale for excluding the NLRB decision, the lack of a record does not preclude us from considering and affirming the district court's decision.

> As at common law, an appellate court reviewing a trial judge's decision to admit or exclude evidence on any of the grounds set forth in Rule 403 will generally affirm if the record reflects that there is any reasonable basis for the lower court's result, even if that basis was not articulated on the record.

American Bar Association, Section of Litigation, *Emerging Problems Under The Federal Rules of Evidence* 59 (1983).

The district court did not abuse its discretion in choosing to exclude the evidence that the NLRB elected not to issue a complaint. The pertinent documents are, in the first place, probative of almost nothing. They do not provide the factual basis for the

NLRB's conclusion of insufficient evidence, other than to state that "the record reflected that the Employer has taken action against other employees over the years for what it believed was similar job-related occurrences involving trucking equipment." Second, we agree with the plaintiff's claim that the jury would be quite likely to assign greater value to this decision than it is worth, given that it is the product only of an administrative investigation, and not of an adjudicatory procedure. Thus, the documents would be unduly prejudicial. When the possible prejudice is balanced against the negligible probative value, we conclude that the district court did not abuse its discretion in excluding the documents relating to the NLRB's decision not to issue a complaint.

## III.

We **REVERSE** the district court's order vacating in part the jury's damage award, and **REMAND** for entry of judgment on the award. We **AFFIRM** all other aspects of the district court's judgment.