51 F.3d 271
 150 L.R.R.M. (BNA) 2575
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ASSOCIATION OF FRIGIDAIRE MODEL MAKERS, et al., Plaintiffs-Appellants,
v.
GENERAL MOTORS CORP. and International Union of Electrical,
Radio, & Machine Workers, Local 801, AFL-CIO-CFC,
Defendants-Appellees.
 Nos. 93-3184, 93-3697, 93-3245, 93-3645.
 United States Court of Appeals, Sixth Circuit.
 March 31, 1995.
 
 Before: MARTIN and BOGGS, Circuit Judges; and FORESTER, District Judge.*
 PER CURIAM.
 
 
 1
 The plaintiffs ("the Model Makers") are a group[1] of skilled tradesmen formerly employed as model makers by the now-defunct Frigidaire Division of defendant General Motors Corporation ("GM"). They appeal the district court's entry of judgment as a matter of law dismissing their hybrid Sec. 301 breach of agreement/duty of fair representation claim against GM and co-defendant International Union of Electrical, Radio & Machine Workers, Local 801, AFL-CIO-CLC ("the Union").
 
 
 2
 The Model Makers make three arguments on appeal: (1) Federal Rule of Civil Procedure 50(b) precludes consideration of the defendants' renewed motion for judgment as a matter of law; (2) the district court violated the "law of the case" by applying Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65 (1991); and (3) the district court deprived the plaintiffs of due process by denying them expeditious resolution of this case. We reject these arguments and affirm the district court's dismissal of this case.
 
 
 3
 * This appeal comes to the court with a tortured past.[2] Briefly, this suit arose out of the decision by GM in 1979 to sell its Frigidaire Division and to convert two Dayton, Ohio, Frigidaire production plants for use by its Chevrolet division.[3] Almost all employees at the Frigidaire plants were to be laid off during a two-year transition period.
 
 
 4
 The defendants agreed to employ in the Chevrolet plant, with unbroken seniority, those Frigidaire workers who were union members. Most of the skilled tradespersons from the Frigidaire facilities could have found equivalent positions at Chevrolet, but since Chevrolet had relegated all modeling activity to its facility in Warren, Michigan, the Model Makers were no longer needed in Dayton. The defendants informally agreed to establish a joint union-management committee to reclassify the Model Makers into another skilled trade classification, which would make them eligible for jobs in Dayton.
 
 
 5
 Union members ratified the plant closing agreement in February of 1979, and layoffs began shortly thereafter. During the transition period, the joint committee successfully reclassified all model makers at the Dayton plants, but these reassigned workers were not given seniority credit for their time working at Frigidaire. On June 24, 1981, the plaintiffs sued, alleging that GM had breached the plant-closing agreement, in violation of the Labor Management Relations Act, 29 U.S.C. Sec. 185, and that the Union had breached its duty of fair representation by permitting the plaintiffs to be reclassified without retaining their seniority rights.
 
 
 6
 The district court bifurcated the liability and damages issues, and the liability question was tried before a jury. On June 23, 1982, the jury rendered a verdict for the Model Makers, and the court entered judgment "for the Plaintiffs and against the defendants as to liability only" on July 26, 1982.
 
 
 7
 Following the jury verdict, the defendants moved for judgment notwithstanding the verdict. On September 21, 1983, the trial court held that the statute of limitations barred the Model Makers' claims and granted the defendants' motion.[4] The plaintiffs appealed the decision to this court, and the defendants cross-appealed, arguing that the Model Makers had failed to produce sufficient evidence of bad faith or arbitrary conduct by the Union or breach of the plant-closing agreement by GM.
 
 
 8
 In Adkins v. International Union of Elec., Radio & Mach. Workers, Local 801, 769 F.2d 330 (6th Cir.1985), another panel of this court agreed that a six-month statute of limitation applied, but remanded the case for a determination of when the plaintiffs' cause of action accrued. The court also rejected the defendants' cross-appeal:
 
 
 9
 A hybrid section 301/unfair representation claim requires the plaintiff to show that the employer breached the collective bargaining agreement and that the union acted in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. [DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-64 (1983) ].... [P]laintiffs properly produced evidence that [GM] agreed to immediately reclassify the plaintiffs and failed to do so and that the union represented the model makers in an arbitrary or perfunctory manner; we reject defendants' contention that arbitrariness is an inappropriate standard to apply to union conduct when negotiating contract provisions. The evidence of a claim was far from uncontroverted, but it was sufficient to sustain a jury verdict.
 
 
 10
 Adkins, 769 F.2d at 336-37 (emphasis added).
 
 
 11
 Upon remand, the district court concluded that the plaintiffs' claim accrued late enough to make its suit timely, and entered an order on July 1, 1988, captioned as follows:
 
 
 12
 DECISION AND ENTRY AFFIRMING THE VERDICT OF THE JURY; JUDGMENT ENTERED IN FAVOR OF THE PLAINTIFFS AND AGAINST THE DEFENDANTS; ORDER OF REFERENCE TO UNITED STATES MAGISTRATE TO ASSESS AMOUNT OF DAMAGES AND TO AFFIX THE SENIORITY RIGHTS AND OBLIGATIONS OF THE PARTIES, PURSUANT TO THE JURY VERDICT.
 
 
 13
 In the order, the court concluded that "the verdict of the jury must be affirmed and that judgment must ultimately be entered in favor of the Plaintiffs and against the Defendants." (emphasis added).
 
 
 14
 With the issue of damages still pending before the magistrate judge, the defendants, on May 28, 1991, renewed their motion for judgment notwithstanding the verdict, (now designated as a motion for judgment as a matter of law). They asserted that in Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65 (1991), the Supreme Court had articulated a new definition of arbitrary union conduct in hybrid Sec. 301 suits, and that the plaintiffs had not satisfied this standard. On December 31, 1992, the district court agreed and entered judgment in favor of the defendants. This appeal followed.
 
 II
 
 15
 The standard for reviewing a district court's ruling on a motion for judgment as a matter of law is identical to that governing a motion for judgment notwithstanding the verdict. Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir.1994):
 
 
 16
 [T]his court reviews a motion for judgment as a matter of law using the same standard used by the district court. The court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences.
 
 
 17
 Ibid. (citations omitted). Accordingly, the motion should be sustained only "[i]f the evidence 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion.' " Marsh v. Arn, 937 F.2d 1056, 1060 (6th Cir.1991), quoting Ratliff v. Wellington Exempted Village Schools Bd. of Educ., 820 F.2d 792, 795 (6th Cir.1987).
 
 III
 
 18
 The Model Makers argue that the district court's order granting judgment as a matter of law violated Rule 50(b)[5] because the defendants renewed their prior motion on May 28, 1991, almost nine years after the district court originally entered judgment for the plaintiffs on July 26, 1982. Alternatively, they argue that the district court's July 1, 1988 "decision and entry" constituted a judgment in the plaintiffs' favor, and that the defendants' May 1991 renewed motion was not filed within 10 days of this judgment. They urge this court to find that there was a judgment outstanding when the defendants filed their May 1991 motion, because for the court to hold the trial record open for nine years would be "patently ludicrous, manifestly unjust, and probably a denial of due process." Thus, the plaintiffs' timeliness challenge hinges upon whether the district court had ever entered a judgment sufficient to start the running of the ten-day limitations period of Rule 50(b).
 
 
 19
 We hold that there has not been such a judgment in this case. A jury finding of liability is not a final judgment for the purposes of Federal Rule of Civil Procedure 50(b). The federal rules define "judgment" to include "a decree and any order from which an appeal lies." Fed.R.Civ.P. 54(a). In addition, "[e]very judgment shall be set forth on a separate document ... [and] is effective only when so set forth and when entered as provided in Rule 79(a) [into the civil docket]." Fed.R.Civ.P. 58.
 
 
 20
 This court has observed that a district court's filing of a memorandum opinion does not constitute a judgment, and that the time limitations for post-judgment motions do not begin to run until "a separate document setting forth the judgment in compliance with Rule 58 [has been] entered." Jetero Constr. Co., Inc. v. South Memphis Lumber Co., 531 F.2d 1348, 1351 (6th Cir.1976). Further, a court's jurisdiction continues "[u]ntil the entry of its judgment disposing of the litigation," and a court retains the "inherent power to correct any error of its own which it may have previously made...." Ibid. (citations omitted).
 
 
 21
 A judgment in a bifurcated proceeding is not final until both liability and damages have been fully resolved. Brown v. United States Postal Serv., 860 F.2d 884, 886 (9th Cir.1988) (concluding that "[a] district court judgment of liability is not a final judgment where it remains for the district court to assess damages or adjudicate other claims for relief"); O. Hommel Co. v. Ferro Corp., 659 F.2d 340, 353 (3d Cir.1981) (holding that the term "judgment" in Rule 50(b) is limited to final judgments), cert. denied, 455 U.S. 1017 (1982); Warner v. Rossignol, 513 F.2d 678, 684 n. 3 (1st Cir.1975) (rejecting in a bifurcated trial "plaintiff's contention that a new trial motion with respect to liability had to be filed within ten days of entry of the interlocutory judgment ... [because] '[t]he judgment' referred to in [Rule 59(b) ] is the final judgment that will be entered after damages are assessed.").
 
 
 22
 Despite the passage of almost nine years from the jury's verdict, there simply was no outstanding judgment on record at the time the defendants filed their renewed motion. The remand from this court did not order reinstatement of the July 26, 1982, judgment in the plaintiffs' favor, but instead required "a determination of whether the plaintiffs' January 1981 attempt to file grievances prevented accrual of their claim until that time." Adkins, 769 F.2d at 337. Nor was the district court's July 1, 1988, "DECISION AND ENTRY" a final judgment for this purpose: the document was in the form of a memorandum opinion that specifically stated that "a judgment must ultimately be entered in favor of the plaintiffs." In addition, no separate document entering judgment pursuant to this memorandum opinion was ever filed as required by Fed.R.Civ.P. 58. Accordingly, the district court was correct in concluding that "as of the time of the filing of the motion under discussion, there was no valid judgment in force in this litigation."
 
 IV
 
 23
 The absence of a final judgment is of consequence only if the Supreme Court's decision in Air Line Pilots set forth a new rule. Thus, the district court could not revisit its prior determination that the union's conduct breached its duty of fair representation without violating the law already established in this case. This court has observed that the law of the case "applies with equal vigor to the decisions of a coordinate court in the same case and to a court's own decisions." United States v. Todd, 920 F.2d 399, 403 (6th Cir.1990).
 
 
 24
 In Arizona v. California, 460 U.S. 605, 618 (1983), the Supreme Court noted that "the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Nonetheless, "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power.... [I]t is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." Id. at 618 & n. 8 (citations omitted). Therefore, the "law of the case" doctrine precludes reconsideration of settled issues unless a "controlling authority" sets forth a "contrary view of the law." White v. Murtha, 377 F.2d 428, 431-32 (5th Cir.1968).
 
 
 25
 The plaintiffs' position rests entirely on their characterization of the Supreme Court's intervening decision in Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65 (1991), as a mere clarification of the law, rather than a contrary decision of law. In Air Line Pilots, the Court considered the case of striking airline pilots who, by virtue of the back-to-work agreement negotiated by their union, received less favorable treatment than if they had unilaterally agreed to return to work. 499 U.S. at 79. The Court held that the standard for determining whether a union breaches its duty of fair representation in contract negotiations was the same as that for other union conduct: "a union breaches its duty ... if its actions are either 'arbitrary, discriminatory, or in bad faith.' " Id. at 67. The Court's definition of "arbitrary" afforded great deference to the union:
 
 
 26
 Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.... [T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'
 
 
 27
 Id. at 78 (citation omitted).
 
 
 28
 While the Court characterized its decision in Air Line Pilots as "clarifying" the duty of fair representation standard, this court saw it in Ackley v. Local 337, Int'l Brotherhood of Teamsters, 948 F.2d 267 (6th Cir.1991), as enough of a change in existing circuit law to warrant vacating a decision it had held for rehearing, pending the outcome of Air Line Pilots. The Ackley case involved an employer's decision to merge the employees and functions of two separate facilities into a new facility. Different union locals had represented employees of the two original facilities, but only one was allowed to represent the combined workforce. The appointed local negotiated full seniority for its members, but "endtailed"[6] the seniority of the other local's workers, who were on layoff status when the facilities merged. A jury found that the local had breached its duty of fair representation to the endtailed employees.
 
 
 29
 In this court's vacated opinion, the majority held that the plaintiffs had presented sufficient evidence of hostility by the local to sustain the jury verdict. Ackley v. Local 337, Int'l Brotherhood of Teamsters, 910 F.2d 1295, 1300 (6th Cir.1990) ("Ackley I "). Judge Nelson dissented on the grounds that there was nothing irrational or hostile about the local's action, and that the company and the union, faced with a shrinking market, had made a difficult decision.[7] Under such circumstances, he reasoned that the fact that some employees received full seniority while others were endtailed was not a breach of the union's duty to represent the workers fairly:
 
 
 30
 This is not a case where the union was motivated to discriminate against one faction on racial grounds ... [or] because that group had resisted unionization.... [Nor is it] a case where a motive to discriminate unfairly and in bad faith could be inferred from the fact that the union's position was "unsupported by any rational argument whatsoever." ... [T]he bargaining position taken by the union ... was supported by an eminently rational argument.
 
 
 31
 Id. at 1307-08 (Nelson, J., dissenting) (citations omitted).
 
 
 32
 Following the Supreme Court's decision in Air Line Pilots, Judge Nelson's dissenting opinion was summarily adopted as the majority opinion:
 
 
 33
 The O'Neill case has now been decided. It teaches us that what a union does in its negotiating capacity is not actionable absent proof of bad faith, discrimination, or behavior so unreasonable as to be irrational.... Having reexamined the record of the instant case in light of O'Neill, we are satisfied, essentially for the reasons stated by Judge Nelson in the dissenting opinion ... that there is no basis on which the jury could properly have found the union's conduct to have been arbitrary, discriminatory, or irrational.
 
 
 34
 Ackley v. Local 337, Int'l Brotherhood of Teamsters, 948 F.2d 267 (6th Cir.1991) (citation omitted).
 
 
 35
 This court agrees that Air Line Pilots enunciated a "contrary view of the law" applicable to this case. Otherwise, there would have been no need for the Ackley I court to reverse itself. Given that the district court is not only constrained by the law of the case, but is also obligated to follow controlling authority, adopting the plaintiffs' position would require the district court to ignore a decision of the Supreme Court, which clearly "would work a manifest injustice." Arizona v. California, 460 U.S. at 618 n. 8. Admittedly, a district court will only rarely be forced to vacate a jury's verdict, but that makes it no less appropriate in particular circumstances. The parties' own actions in prolonging the damages portion of the litigation only increased the possibility of an intervening change in the law. Based on the foregoing, the plaintiffs' contention that the district court's decision violated the law of the case is without merit.
 
 V
 
 36
 The Model Makers argue that the passage of more than a decade since their complaint was filed violates their trial rights under the Seventh Amendment and Federal Rule of Civil Procedure 1, and that the protracted nature of the proceedings has denied them due process. The defendants counter that the plaintiffs should not prevail simply because of the length of the proceedings. Moreover, the defendants maintain that most of the delays in this case are directly attributable to the plaintiffs, and that the plaintiffs have identified no instance in which the defendants engaged in dilatory tactics.
 
 
 37
 The Seventh Amendment does not address the speed with which civil litigation must proceed. It would be unprecedented to read it as authorizing a judgment in the plaintiffs' favor merely because it took the court system thirteen years to dispose of their claim finally; the defendants have been equally hindered. This unusually long delay was due in part to the parties' own decisions, so that any injustice or outrage is self-inflicted; the primary culprit is the parties' inability to conclude the damages segment of the trial for almost thirteen years. Both sides contributed to, as well as benefitted from, the delay: six years of the litigation was spent adjudicating a threshold issue of the statute of limitations, a ruling that enabled the plaintiffs to proceed to trial. In short, both sides have nobody to blame but themselves.
 
 
 38
 For the foregoing reasons, we put this litigation to final rest and AFFIRM the district court's judgment for the defendants.
 
 
 
 *
 The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 There seems to be a question of how many people are suing the defendants. Petitioners refer to forty-nine plaintiffs, respondents state that there are forty-eight, and our count of those listed in the complaint is fifty-two (including the estates of eight who have died)
 
 
 [2]
 After the district court entered the final judgment on its docket sheet on December 31, 1992, plaintiffs filed their first notice of appeal (No. 93-3097) on January 28, 1993, within the thirty days allowed by Fed.R.App.P. 4(a)(1). However, they improperly identified the party taking appeal as "Association of Model Makers, et al." instead of listing each party individually. On February 16, 1993, plaintiffs moved for an extension of time to appeal (No. 93-3184) pursuant to Fed.R.App.P. 4(a)(5), which permits such motions within sixty days of a final judgment "upon a showing of excusable neglect or good cause." The next day, the district court granted the extension in a notation order. Defendants moved for relief from this order since they were not given an opportunity to contest plaintiffs' motion. Plaintiffs again moved for an extension of time to appeal (No. 93-3245) on February 26
 In an order dated March 18, 1993, the district court vacated its notation order sua sponte, thus mooting defendants' motion for relief. On May 28, 1993, the court granted the extension of time to appeal that was sought by plaintiff's motion of February 26, giving plaintiffs ten days to file notice of appeal; they did so on June 2, 1993 (No. 93-3645). Defendants appealed the court's extension on June 18 (No. 93-3697), arguing that there was neither good cause or excusable neglect.
 We find no abuse of discretion, and agree completely with the district court's reasoning in its May 28 decision. Since both of plaintiff's motions were within sixty days of the final judgment, we have jurisdiction to hear this appeal.
 
 
 [3]
 The opinion in Adkins v. International Union of Elec., Radio & Mach. Workers, 769 F.2d 330 (6th Cir.1985), gives a more detailed history of this litigation
 
 
 [4]
 Association of Frigidaire Model Makers v. General Motors Corp., 573 F.Supp. 236 (S.D.Ohio 1983)
 
 
 [5]
 A motion for judgment as a matter of law, having been made and denied at the close of all the evidence, "may be renewed by service and filing not later than 10 days after entry of judgment." Fed.R.Civ.P. 50(b)
 
 
 [6]
 The term "endtailing" refers to the practice, when two locals merge, of giving less seniority to some employees
 
 
 [7]
 "Because there were not enough jobs to go around ... some employees who wanted to work there and who felt they had legitimate claims on jobs at the facility were inevitably going to lose out. It was up to the union and the company to decide, through the collective bargaining process, who the individual winners and losers would be in this zero-sum game." Id. at 1307 (Nelson, J., dissenting)