Gregory J. WALTERS and Kenneth
R. Sabotka, Plaintiffs,

v.

LOCAL UNION NO. 337, affiliated with
the International Brotherhood of Team-
sters, Chauffers, Warehousemen & Help-
ers of America a/k/a Food and Beverage
Drivers, Warehousemen & Helpers Lo-
cal Union No. 337, Pepsico, Inc., a for-
eign corporation, Pepsi–Cola Personnel,
Inc., a foreign corporation, Pepsi–Cola
Bottling Company, Inc., a foreign corpo-
ration, and Pepsi–Cola Company, an en-
tity, Defendants.

Civil Action No. 97–40045.

United States District Court,
E.D. Michigan,
Southern Division.

April 30, 1998.

Neill T. Riddell, Eames Wilcox, Detroit, MI, for Plaintiffs.

George R. Geller, George R. Geller, P.C., Farmington Hills, MI, for Defendant Local Union No. 337, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Thomas H. Christopher, Peter G. Golden, Kilpatrick Stockton LLP, Atlanta, GA, Donald A. Van Suilichem, Christina Brookshire, Van Suilichem & Brown, Detroit, MI, for Defendant PepsiCo, Inc., Pepsi-Cola Personnel, Inc., Pepsi-Cola Metropolitan Bottling Co., Inc., Pepsi-Cola Co.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Plaintiffs Gregory Walters and Kenneth Sabotka filed this action against Pepsi, their former employer,[1] as well as the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local Union No. 337, the Union of which they were members, alleging a hybrid claim under § 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185. Presently before this court are motions for summary judgment filed by defendants Pepsi and the Union. For the following reasons, this court will grant the motions and dismiss this case with prejudice.

1. Actually, plaintiffs name Pepsico, Inc., Pepsi–Cola Personnel, Inc., Pepsi–Cola Metropolitan Bottling Company, and Pepsi–Cola Company as defendants. This court will refer to all these defendants collectively as "Pepsi."

## FACTS

Pepsi is a manufacturer, seller and distributor of soft drinks. It owns a number of facilities in southeast Michigan, including one in Howell. In 1987, plaintiffs Walters and Sabotka, then-members of Local Union No. 337 (the "Union"), were hired as route drivers for the Howell facility.[2]

Plaintiffs were discharged in 1996 as a result of an incident which occurred on September 11 of that year. On September 11, 1996, plaintiffs were in the "Sales Room" of Pepsi's Howell facility, along with John Jackson, a Pepsi first tier manager, and Bill Richards, a route driver. At one point, Walters left the Sales Room and went into the abutting office of manager, Erik Kline. While in Kline's office, Walters took a duffel bag bearing the Pepsi logo.[3] (Walters Dep. at 17). When he re-entered the Sales Room with the bag, Walters asked Jackson if he could have it, to which Jackson jokingly replied, "I don't care, go ahead." (Walters Dep. at 18, 68).[4] Walters then returned the bag to Kline's office so that others would not see the bag. (Walters Dep. at 19). Walters decided to return for the bag at a later time. (Walters Dep. at 19).

Thereafter, Sabotka entered Kline's office and took a second duffle bag. Upon returning to the Sales Room, Sabotka commented that the bag was nice and then looked at Jackson who said something to the effect of "I don't see anything, I don't say anything." (Walters Dep. at 18–19).

Sabotka then re-entered Kline's office and took the same bag Walters had replaced sometime earlier. (Sabotka Dep. at 51). Now Sabotka had two duffel bags. Sabotka hid both duffel bags under his sweatshirt. (Sabotka Dep. at 51). Sabotka then proceeded to walk out of the plant to the company's parking lot, accompanied by Walters who, at that time had "a pretty good idea" that Sabotka had hidden bags under his sweatshirt. (Walters Dep. at 22). Both men walked to their cars. Before leaving the lot, Sabotka drove to Walter's vehicle and handed Walters one of the two duffel bags, keeping the other for himself. (Sabotka Dep. at 53; Walters Dep. at 25).

Later that day, Kline realized that two bags were missing from his office. (Kline Dep. at 23). Kline made numerous telephone calls and inquiries in an attempt to locate them. (Kline Dep. at 26–31).

2. Pepsi and the Union are parties to a collective bargaining agreement ("CBA") effective January 28, 1996 to January 29, 2000. One of the provisions relevant to this dispute is Article IV, which provides as follows:

The Employer shall not discharge nor suspend any employee without just cause and in respect to such discharge or suspension shall follow the following procedure:
1) For the first (1st) complaint the employee shall receive a verbal warning.
2) For a second (2nd) complaint the employee shall receive a written warning and a one (1) day suspension.
3) For a third (3rd) complaint the employee shall receive a written warning and a three (3) day suspension.
4) For a fourth (4th) complaint the employee shall be subject to discharge.
The Employer must impose discipline within ten (10) calendar days of the occurrence of the offense or within ten (10) calendar days of the time the employer has learned of the offense or the discipline shall be null and void. Whenever the Employer imposes discipline involving time-off (suspension or discharge), such discipline shall begin within five (5) working days of the time the Employer notified the employee of the discipline imposed. Failure of the Employer to impose discipline within five (5) working days shall render the disciplinary action null and void. The imposition of time off discipline shall not make the employee ineligible for holiday pay provided he has met all other contractual requirements.
The Local Union and Job Steward affected shall receive a copy of all written warning notices.
However, for the following complaints, *no warning notice need be given before discharge:* Possession of firearms, *dishonesty,* being under the influence or possession of illegal drugs during working hours; possession, drinking or being under the influence of alcoholic beverages during work hours ...
(emphasis added).

3. The duffel bag was a promotional item which Kline intended on giving another route driver, who had two children, as a token of appreciation for that driver performing some additional work. (Kline Dep. at 16).

4. Jackson testified at his deposition that he cannot recall what he said in the Sales Room on September 11, 1996. Jackson testified that he may have said, "I see nothing." (Jackson Dep. at 36).

At some time, Scott Eddie, another supervisor, also made inquiries regarding the whereabouts of the bags. Walters overheard Eddie making such inquiries but he did not speak up and mention he knew the whereabouts of the bags. (Walters Dep. at 35–36).[5]

The next morning, September 12, 1996, Kline continued to search for the missing bags. Through his probe he learned that Walters and Sabotka had last been seen with the two duffel bags. Kline summoned Walters and Sabotka, who were then on their routes, back to the Howell facility.

When Walters returned to the Howell facility he met with Kline. Kline asked him repeatedly whether he had removed the bags from the facility. (Walters Dep. at 29). Walters answered unequivocally each time the question was asked with a firm, "no!" (Walters Dep. at 29).[6] Despite Walter's protestations that he did not remove any bag from the facility, Kline suspected Walters had some involvement with the missing bags and told Walters this. In the wake of Kline's accusations, Walters remained silent, neither confirming nor negating Kline's suspicions. (Walters Dep. at 30). Ultimately, Kline suspended Walters and told him that if the bags were returned by 8:00 a.m. the next morning the most likely discipline would be a three-day suspension. (Walters Dep. at 30).

Upon Sabotka's return to the Howell facility, he met with two supervisors, Scott Eddie and Joe Hinkley. Sabotka admitted to removing the two bags from the premises. (Sabotka Dep. at 63). He further explained that he had given one of the bags away in the parking lot. (Sabotka Dep. at 63). When asked to whom he had given the bag, Sabotka told Eddie and Hinkley that they did not need to know the identity of that person since "any consequences [were] due upon [him] [Sabotka]." (Sabotka Dep. at 63–64). When asked why he had taken the bags, Sabotka explained that he believed the company owed him something. (Sabotka Dep. at 63). Sabotka apologized, but was suspended pending further investigation. (Sabotka Dep. at 63–64).

The following week, plaintiffs were asked to meet with Pepsi representatives prior to the imposition of any final discipline. (Walters Dep. at 34; Sabotka Dep. at 70). Each plaintiff attended a separate meeting with Doug Bengel, the assistant Union steward, and Robyn Wilkerson, a company human resources representative. (Sabotka Dep. at 71–74). At Sabotka's meeting, Sabotka explained that he had taken the bags because he "felt [he] was given permission by John Jackson." (Sabotka Dep. at 74). He could not give any reason, however, for why he had concealed the bags. (Sabotka Dep. at 74). At Walter's meeting, he admitted to his involvement in the bag incident as previously described above. (Walters Dep. at 37). In fact, he stated that he was a "dumb-ass" for taking the bags.[7] Plaintiffs were ultimately terminated.

Plaintiffs subsequently filed grievances contesting their termination and requesting that their cases be taken to arbitration. Assistant Union steward, Doug Bengel,[8] immediately began investigating the grievances. Bengel, who had previously been present during Wilkerson's interviews of Walters and Sabotka, conducted interviews of employees involved in the situation. He interviewed Kline, Eddie, Hinkley and Roberts. (Bengel Dep. at 35). He also may have spoken with Jackson. (Bengel Dep. at 33). Bengel prepared a "second chance letter" for Walters and Sabotka. (Bengel Dep. at 35).[9] This

---

5. When Walters was asked why he did not inform Eddie that he had one of the bags, he replied that he did not know. (Walters Dep. at 36).

6. Walters maintains that he was being truthful when he denied removing the bags from the Pepsi facility because he not remove the bags from the *facility*. Instead, he received a bag in the *parking lot* which Sabotka had removed from the facility.

7. In addition to interviewing the plaintiffs, Wilkerson obtained statements regarding the incident

from Scott Eddie, John Jackson and Bill Richards.

8. Typically, the Union steward performed the investigations. As Walters was the Union steward during the relevant time period, the investigatory responsibilities fell on the assistant Union steward, Bengel.

9. Second chance letters are agreements by the company to give an employee one final chance at employment on the express condition that any

letter was denied by Pepsi management. (Bengel Dep. at 35).

After Pepsi indicated that it would not reinstate plaintiffs, the principal responsibility for investigating plaintiff's grievance passed to Local 337's "grievance panel." The grievance panel consists of two to three union business agents assigned to appraise grievances denied at the plant level in order to determine whether Local 337 should take them to arbitration. The panel's investigation is two-tiered. First, a hearing is held at Local 337's Detroit headquarters, at which both the grievant and the employer are invited to give testimony and present witnesses and evidence. Then, on the basis of that record, the panel makes a recommendation to an Executive Board whether to pursue the grievance to arbitration. The Executive Board makes the final decision of whether to take the case to arbitration. (Brooks Dep. at 12–14).

Plaintiffs' hearings before Local 337's grievance panel were set for October 15, 1996. After being informed that it would be his responsibility to produce witnesses at the hearing, Walters contacted Richard Gremaud, Local 337's business agent who administers the Pepsi contract, and told Gremaud that he wanted both Jackson and Kline as witnesses at his hearing. Gremaud assured Walters "not to worry," that if the company "had any kind of case against [the plaintiffs], [Jackson and Kline] would have to be there [at the hearing] to give their side or their statement." (Walters Dep. at 53). Gremaud also told Walters that the company "could not use just hearsay or written statements at this board meeting" and that "people had to be there in person to give their testimony." (Walters Dep. at 53).

Sabotka's hearing on October 15, 1996 began with a recitation of facts by Wilkerson on behalf of the company, which included a recitation of prior statements and admissions made by Sabotka as well as written statements [10] taken from other witnesses such as John Jackson [11] and William Richards.[12] (Brooks Dep. at 64–66; Sabotka Dep. at 117–119; 120–22). Sabotka was then given an opportunity to respond to these statements and present his side of the story. (Sabotka Dep. at 88–89, 110). Among the evidence Sabotka presented was the testimony of Bob Walton, a Union representative, who spoke on behalf of Sabotka's character and reputation. (Sabotka Dep. at 88).

Walter's panel meeting was held immediately after Sabotka's. At the commencement of Walter's hearing, Wilkerson presented various facts to the panel, including the statements made by Walters during Wilkerson's meeting with him, as well as statements made by other employees such as Richards and Jackson. (Walters Dep. at 58–59). Walters was thereafter given an opportunity to respond. (Walters Dep. at 59).

After hearing all the evidence, the panel recommended to the Executive Board that Sabotka's and Walters' grievances be denied and not be pursued to arbitration. The Executive Board, after a session on November 1, 1996, decided to follow the panel's recommendations. This lawsuit then ensued. Presently, defendants are before the court seeking summary judgment pursuant to Federal Rule of Civil Procedure 56.

## ANALYSIS

### Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show

---

subsequent infraction results in immediate termination. (Bengel Dep. at 35).

10. Prior to the hearing, Bengel requested copies of the statements taken by Wilkerson, but Wilkerson would not provide them at that time. Instead, Wilkerson provided these statements either at the conclusion of the hearing or three to four days following the hearing. (Walters Dep. at 114–115; Sabotka Dep. at 75).

11. In Jackson's statement, he admitted saying in a joking manner, "I see nothing, I say nothing."

12. In Richards' statement, he indicated that he understood how plaintiffs may have mistaken Jackson's joking statements for permission to take the bags. Richards further stated, however, that he knew Jackson was joking when he told the plaintiffs, "I see nothing, I say nothing."

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in a light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980).

If the movant meets the standard specified at Rule 56(c), then the opposing party must come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton*, 24 F.3d 823, 826–27 (6th Cir.1994).

### Section 301 of the Labor–Management Relations Act

■ In order to succeed on their. § 301 claim, plaintiffs must show: (1) Pepsi breached the collective bargaining agreement, *and* (2) the Union breached its duty of fair representation. *DelCostello v. Int'l. Brotherhood of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Vaca v. Sipes*, 386 U.S. 171, 187, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In this instance, both Pepsi and the Union contend that summary judgment must be granted in their favor on plaintiffs' § 301 claim because construing the evidence in a light most favorable to the plaintiffs, there is no genuine issue of material fact as to whether the Union breached its duty of fair representation.

### Standard for Determining Whether There Has Been a Breach of the Duty of Fair Representation

■ A "union must provide reasonable assistance to the union member, including, but not limited. to, helping the grievant secure the materials necessary for a fair hearing, putting forward the strongest arguments one could reasonably make on the grievant's behalf, and other forms of assistance or representation necessary for the grievant to adequately prosecute his grievance." *Olsen v. United Parcel Service*, 892 F.2d 1290, 1295 (7th Cir.1990). The standard for determining whether the union has breached the duty of fair representation is tri-partite. A union breaches its duty of fair representation if its conduct towards its members is arbitrary, discriminatory, *or* in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (emphasis added).

> Thus, the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty. In other words, a plaintiff need only show that the union's actions could be characterized in any one of these three ways.

*Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir.1994) (citation omitted). *See also Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir.1995), *cert.*

*denied,* 517 U.S. 1120, 116 S.Ct. 1353, 134 L.Ed.2d 521 (1996).

### *Whether the Union Acted Arbitrarily*

Plaintiffs allege that the following actions by the Union were arbitrary so as to constitute a breach of the duty of fair representation:

- the Union's failure to pursue arbitration in an attempt to get plaintiffs reinstated,
- the Union's finding that the plaintiffs were dishonest;
- the Union's interpretation of the ten-day rule;
- the Union's failure to interview key witnesses;
- the Union's use of hearsay evidence at the panel hearing, and;
- the Union's consideration of the expense involved in proceeding to arbitration.

Each of the allegations will now be discussed *seriatim.*

### *The Union's Failure to Arbitrate in an Effort to Get Plaintiffs Reinstated Was Not Arbitrary*

■ Plaintiffs argue that the Union acted arbitrarily in not taking their cases to arbitration in an attempt to get plaintiffs reinstated. Plaintiffs maintain that an arbitrator *might* have found that discharging plaintiffs for taking the duffel bags was an unduly harsh measure and therefore ordered reinstatement and a lesser sanction, such as suspension. Plaintiffs point out that they both had worked for Pepsi approximately ten years without any prior disciplinary record. Plaintiffs also assert that several months prior to the plaintiffs' discharge, a theft of Pepsi point caps by another individual, Dale Chamberlin, resulted in a lesser sanction than discharge.[13]

While it is true that, as plaintiffs submit, when interpreting just-cause employment provisions such as the one involved in this case, arbitrators sometimes reduce discharge penalties to lesser sanctions even when the employees are guilty of the misconduct charged,[14] it does not follow that the Union *must* seek such lesser penalties via arbitration in order to avoid liability for breach of the duty of fair representation. Simply stated, plaintiffs are arguing that if there is some possibility, however remote, that an arbitrator might mitigate punishment for a grievant, the law commands a union to seek this mitigation, even if the Union finds the grievant guilty of serious misconduct. This argument fails since the Union is under no legal obligation to take a case to arbitration to seek mitigation once it concludes that a grievant is guilty of serious misconduct. *Baker v. Interstate Brands Corp.,* 801 F.Supp. 456, 464 (D.Kan.1992) (holding that employee has no right to arbitration and cannot compel the union to pursue a grievance having no legal merit).

### *The Union's Conclusion That Plaintiffs Were Guilty of Theft and Dishonesty Was Not Irrational*

■ Since the Union is not under an obligation to pursue arbitration when it finds a grievant guilty of serious misconduct, the question is thus whether the Union was rational in concluding the plaintiffs were guilty of the serious misconduct charged against them, to wit: theft and dishonesty. Plaintiffs argue that it was wholly irrational for the Union to arrive at such a conclusion. Plaintiffs contend that there were honest and cogent explanations for plaintiffs' actions on September 11, 1996 and thereafter, which the Union ignored.

For instance, plaintiffs contend that the Union ignored Sabotka's explanation at the panel hearing as to why he hid the duffel bags in his sweatshirt on the way out of the facility on September 11, 1996. Sabotka stated at the hearing that he hid the duffel bags not to conceal a theft of the bags, but to

---

**13.** Plaintiffs present no facts surrounding the suspension of Dale Chamberlin. Rather, plaintiffs ask this court to assume the circumstances surrounding Chamberlin's theft of the Pepsi point caps are similar to the circumstances surrounding plaintiffs' theft of the duffel bags.

**14.** *See Dixie Warehouse and Cartage Co. v. General Drivers, Warehousemen and Helpers, Local Union No. 89,* 898 F.2d 507, 510–11 (6th Cir.1990) (finding that arbitrator was correct in determining that he had authority to modify the penalty under a just cause provision of a CBA).

adhere to a well-established company policy not to parade "gifts" around.

This court finds that the Union did not act arbitrarily in discounting Sabotka' excuse for his furtive actions. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Airline Pilots Assn. v. O'Neill,* 499 U.S. 65, 76, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). In this instance, the Union certainly had a sound basis for finding Sabotka's explanation to be a mere smokescreen. When originally asked why he hid the bags, Sabotka admitted that he had *no* explanation. Also, Sabotka conceded that he received no instruction to keep quiet about the "gifts" of the duffel bags. Thus, the Union was justified in finding that Sabotka's proffered reason for hiding the bags to be an after-the-fact justification.[15]

Plaintiffs further argue that the Union breached it duty of fair representation when it blatantly ignored the reasons Walters gave for not admitting to theft of the bags the day following the incident. At the hearing, Walters stated that he did not immediately tell others about the incident because he felt that he had done nothing wrong and would be playing another role as Union steward, to wit: handling matters for Sabotka. Walters also stated at the hearing that he was not being dishonest when he denied to Kline that he removed the bags from the facility. Walters explained that *he* did not remove the bags from the facility, rather *Sabotka* removed the bags from the facility and he was handed a bag in the parking lot.

15. At oral argument, plaintiffs' attorney stated that Sabotka is an extremely emotional individual who, at the time of initial questioning, was unable to think clearly.

16. Plaintiffs also contend that the panel exceeded its authority in deciding whether or not plaintiffs were believable. Plaintiffs argue that the panel should have limited its analysis to the question of whether there was enough evidence to merit going to arbitration. Plaintiffs cite the deposition testimony of Carlow B. Scalf, Administrative Assistant to the President of Local 337, who frequently sits on panels, but did not sit on the panel which decided plaintiffs' cases. Scalf testified that when a panel is convened, its purpose is to decide whether or not there is enough evidence to take a case to arbitration. Scalf further

This court finds that the Union was justified in finding that Walters had been dishonest. Walter's excuse for not revealing the whereabouts of the bags the day after the incident is flimsy. Additionally, Walters' retort of "no" to Kline's inquiry into whether Walters took the bags from Pepsi's facility does appear to be more cunning deception than honest disclosure.[16] Gremaud sums it up well:

> If they [the duffel bags] weren't stolen why didn't he [Walters] 'fess up and say I took the bag from the man [Sabotka] but I didn't know they were stolen? He tried to hide it . . . When he took the bag he was on company property. Next day at the meeting he makes a statement that he knows nothing about the bags, he don't know nothing . . . And all I am saying is why would he do that? The man knew they were stolen goods when he took it from Ken.'

(Gremaud Dep. at 88–90).

In short, the relevant question is not whether the Union was *correct* in concluding that plaintiffs had been dishonest but rather, whether the Union was *rational* in finding the same. This court concludes that the evidence, when viewed in a light most favorable to the plaintiffs, supports the rationality of the Union's decision.

### The Union Did Not Act Arbitrarily In Finding The Ten Day Rule Was Not Violated

Plaintiffs also argue that the Union breached its duty of fair representation by

testified that in making this determination, the Union does not "necessarily" have to decide whether or not an employee is being truthful. (Scalf Dep. at 9–10).

This court does not find Scalf's testimony supportive of plaintiffs' argument. Scalf did not aver that a panel is foreclosed from deciding whether a grievant is guilty of misconduct when deciding whether there is enough evidence to take a case to arbitration. Rather, he merely stated that the panel does not always have to decide that question. Indeed, it seems to this court that in the majority of cases that question would have to be determined by a panel. The merits of an arbitration hinge in great part on the guilt or innocence of the grievant.

erroneously interpreting the following provision in the CBA, the so-called "ten-day rule:"

the Employer shall impose discipline within ten (10) calendar days of the occurrence of the offense or within ten (10) calendar days of the time the employer learns of the offense or the discipline shall be null and void.

The Union found that this rule was satisfied, but plaintiffs maintain that it was flagrantly violated and that the Union should have argued as much at arbitration.[17] According to plaintiffs, "discipline" as it is used in the ten-day rule means "final discipline." Since plaintiffs were not finally disciplined (i.e., discharged) within ten days of the theft of the duffel bags, so they assert, the ten-day rule was violated.

This court finds no breach of the duty of fair representation in the Union's interpretation of the ten-day rule. The literal language of the Rule appears to have been fulfilled, just as the Union so found. The Rule does not call for *final discipline* to be imposed within a ten-day period. Rather, the provision only calls for *some form of discipline* to be administered within ten days of the offense. Plaintiffs did receive some form of discipline (i.e., suspension) within the relevant ten-day time frame. (Gremaud Dep. at 24–25, 74–75; Wilkerson Dep. at 52).

■ Moreover, assuming the Union's interpretation was erroneous, this court still would not find a breach of the duty of fair representation since any such misinterpretation was merely negligent. *Poole v. Budd Co.,* 706 F.2d 181, 185 (6th Cir.1983); *Lucas v. Leaseway Multi Transp. Service, Inc.,* 738 F.Supp. 214, 219 (E.D.Mich.1990). There is no evidence indicating that such a misinterpretation was intentional or reckless.

### The Union's Investigation Was Not Perfunctory

[10] Plaintiffs claim that the Union breached its duty of fair representation by performing a perfunctory investigation. Plaintiffs assert that two key witnesses, John Jackson and Bill Richards, were not interviewed by the Union and were not presented as live witnesses at the panel hearing.

This court finds that the Union performed more than a perfunctory investigation. First, the Union's failure to interview Jackson and secure his live presence at the panel hearing (despite Walters' request) did not amount to a breach of the duty of fair representation. Plaintiffs contend that if interviewed and presented as a witness, Jackson might have admitted to giving plaintiffs permission to take the bags and thereby validated plaintiffs' story. Yet, the evidence does not support this argument. In a statement to Pepsi management, which was presented at the hearing, Jackson denied giving plaintiffs permission to take the bags. He merely acknowledged that some form of banter ensued between him and the plaintiffs regarding the taking of the bags. Then, under oath at his deposition, Jackson again denied giving plaintiffs permission to take the bags.[18]

Likewise, the Union's failure to interview Richards and present his testimony live at the panel hearing did not constitute a breach of the duty of fair representation. Richards was hardly a "star witness" for the plaintiffs. In a statement to Pepsi management, which was presented at the panel hearing, Richards said that he understood how plaintiffs might have misinterpreted Jackson's teasing for blatant consent to take the bags. The Union determined that in providing this statement, Richards was merely attempting to protect fellow Union members, especially since Richards admitted that he, himself, knew that Jackson was only joking and did not give plaintiffs permission to take the bags on the date in question. There is no evidence that the panel would have arrived at any other

---

17. A union's failure to advance every argument at arbitration does not amount to a breach of the duty of fair representation. "[M]ere negligence or poor judgement on the part of the union will not support a claim of unfair representation." *Black,* 15 F.3d at 584. *See also Lucas v. Leaseway Multi–Transp. Service, Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990).

18. Also, while the Union's failure to interview and secure the live testimony of Jackson may seem slipshod to a trained lawyer, a Union steward is not held to the same standard that an attorney is held.

conclusion if Richards had testified live at the panel hearing.

In sum, this court finds that the Union's investigation was not arbitrarily performed. Indeed, every fact that is known today, after significant discovery, was known to the Union at the time it made its decision not to pursue arbitration. This is certainly potent evidence that the Union conducted more than a perfunctory inquiry into the matter.

### The Union Did Not Breach Its Duty of Fair Representation by Taking Into Account the Expense of Proceeding to Arbitration

■ Plaintiffs argue that the Union acted arbitrarily in only taking into account financial considerations when it decided not to take plaintiffs' cases to arbitration. This argument borders on preposterous. It ignores the substantial evidence presented at the hearing which indicates plaintiffs' guilt, such as Sabotka's surreptitious placement of the duffel bags under his sweatshirt when taking them, the clandestine transfer of one of the bags to Walters in the parking lot, Walters' evasiveness when interviewed by Kline the day following the incident and Richards' statement that he knew Jackson was only joking when he gave plaintiff permission to take the bags. Given the many indicia of plaintiffs' guilt which were submitted to the panel, this court cannot conclude that the Union's decision not to pursue arbitration was based *solely* on financial considerations.[19] The Union also based its decision on its finding the plaintiffs to be guilty of dishonesty.[20]

### The Union Did Not Discriminate Against Walters

■ Plaintiff Walters argues that the evidence "fully supports a conclusion that the Union's failure to arbitrate his discharge was the result of discriminatory treatment directed toward him due to his position as a[U]nion steward" and as such, shows that the Union breached its duty of fair representation. More pointedly, Walters contends that the Union was unduly harsh in processing his grievance and held him to a higher standard because he was a Union steward.[21]

■ This court finds Walters' claim of discrimination fails as a matter of law. A breach of the duty of fair representation only occurs when a union *invidiously* discriminates against one of its members in a manner "unrelated to union objectives," e.g., discrimination based on race, gender or disability. *Amalgamated Ass'n. of Street, Elec. Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Baker v. Interstate Brands Corp.*, 801 F.Supp. 456, 464 (D.Kan.1992). Expecting more of Union stewards is not unrelated to legitimate Union objectives. It is harmful to the Union when a steward is caught stealing and withholding the truth. The members lose confidence and the Union loses credibility in the eyes of management.[22]

In sum, this court find that, given the totality of circumstances, defendants' are entitled to summary judgment as a matter of law on plaintiffs' § 301 claim. Viewing the evidence in a light most favorable to the plaintiffs, there is no genuine issue of material fact as to whether the Union breached its duty of fair representation. All the acts of

19. While financial considerations may have played some part in the decision not to pursue arbitration, this was appropriate. It is proper for a union to weigh the expenses of arbitration against the merits of the case. *See e.g., Fritz v. Production Plated Plastics, Inc.*, 676 F.Supp. 148, 151 (W.D.Mich.1987) ("[t]he Court cannot say that consideration of cost is an improper factor for use in determining whether to pursue arbitration").

20. Plaintiffs point out that not only were Walters and Sabotka not forthcoming with information about the incident, but Jackson was also initially less than forthright about his observations on September 11, 1996. While not supportive of

plaintiffs' § 301 claim, this evidence does show that perhaps Jackson should have also been disciplined.

21. Plaintiffs claim that this bias against Walters spilled over when processing Sabotka's grievance.

22. At oral argument, plaintiffs' attorney contended that the Union was "hostile" against Walters and Sabotka and therefore acted irrationally in deciding not to pursue their grievances to arbitration. There is no evidence, however, that the Union was "hostile" toward these two plaintiffs.

the Union viewed separately, or together, including, but not limited to, the length of plaintiffs' good service, the Union's failure to secure Jackson and Richards as witnesses at the hearing, and the Union's failure to seek mitigation of punishment, do not amount to a breach of the duty of fair representation.

## ORDER

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment be GRANTED and this case be DISMISSED with prejudice.

**SO ORDERED.**