Randy HUGHES, Plaintiff,

v.

GENERAL MOTORS CORP.,
et al., Defendants.

No. C–3–96–431.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 5, 2001.

Richard B. Reiling, Walsh Harrison & Reiling, Dayton, OH, for Randy Hughes.

G. Randall Ayers, Jerry Sylvester Sallee, John Matthew Kunst, Jr., Dinsmore & Shohl, Cincinnati, OH, for General Motors Corp.

Richard Frederic Rice, Kettering, OH, Alexia McCaskill, Washington, DC, for International Union of Electronic, Electrical, Salaried, Mach. and Furniture Workers, AFL-CIO, James R. Marlos, John Huff.

Stewart Ralph Jaffy, Narc J. Jaffy, Stewart Jaffy & Associates, Columbus, OH, for Local 81 International Union Electronic Electrical Tech Salaried and Mach. Workers.

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT LOCAL 801 (DOC. # 72); MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT GENERAL MOTORS CORPORATION (DOC. # 73) SUSTAINED; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

This litigation stems from Plaintiff Randy Hughes' loss of employment with Defendant General Motors Corporation ("GM") in Dayton, Ohio. GM fired Hughes in 1996 when he failed to return to work after taking an approved medical leave. Following his termination, Hughes filed a Complaint and, later, an amended Complaint against GM, his Local 801 Union ("Local 801" or "the Union") and others.[1] (Doc. # 1, 17). In his amended Complaint,

---

1. Hughes also named as Defendants his International Union and several individual members of Local 801. In an August 24, 1998, Decision and Entry (Doc. # 50), the Court entered summary judgment in favor of those Defendants. As a result, GM and Local 801 are the only Defendants remaining in this litigation.

Hughes alleged that he had been discharged in violation of a collective bargaining agreement (CBA) between GM and Local 801. The Plaintiff also alleged that Local 801 had breached its duty of fair representation through dilatory processing of a grievance that he filed against GM to contest his termination.[2]

In an August 24, 1998, Decision and Entry (Doc. # 50), the Court overruled two Motions for Summary Judgment (Doc. # 30, 33), insofar as those Motions related to Defendants GM and Local 801.[3] In so doing, the Court found a genuine issue of material fact regarding Hughes' allegation that Local 801 had breached its duty of fair representation by not processing his grievance, thereby resulting in prejudice by causing the grievance to expire. (Doc. # 50 at 14–16). The Court also found a genuine issue of material fact concerning Hughes' claim that continued pursuit of his grievance through administrative channels would be futile. The Court based this conclusion upon an unexplained (then) sixteen-month delay in Local 801's processing of his grievance. (*Id.* at 16–19).

Following the Court's ruling, however, GM and Local 801 settled Hughes' grievance without resorting to arbitration. (Affidavit of Craig N. Jones, attached to Doc. # 56, at ¶ 8). The settlement was reduced to writing in the form of a December 15, 1998, "Reinstatement Agreement." (*Id.* at Exh. 1). The Agreement reinstated Hughes on a "last chance" basis, and it required him to report to work on January 4, 1999. (*Id.*). It also provided that Hughes would have a "Balance and Thirty (30) Day penalty recorded on both tiers of his disciplinary record...." (*Id.*). Finally,

the Reinstatement Agreement treated Hughes' absence from March 28, 1996, until January 4, 1999, as personal leave. (*Id.*). As a result, he did not receive a back pay award for the period of his absence. Hughes received notice of the settlement, and his return-to-work date, on December 23, 1998. (*Id.* at Exh. 2, 3). At that time, he was residing in High Point, North Carolina, and he never returned to work at GM. (Jones affidavit, at ¶ 10).

Following the settlement of Hughes' grievance, GM and Local 801 filed renewed Motions for Summary Judgment (Doc. ## 54, 56), arguing that a genuine issue of material fact no longer existed regarding the Union's alleged breach of its duty of fair representation. In a July 16, 1999, Decision and Entry (Doc. # 64), the Court sustained these renewed Motions. In so doing, the Court recognized "that a union breaches its duty of fair representation when its conduct is arbitrary, discriminatory, or in bad faith, *and* where said conduct is prejudicial to the employee." (*Id.* at 10). In other words, with respect to a grievance, a union breaches its duty of fair representation only if it proximately causes a plaintiff to lose rights he enjoyed under a CBA. (*Id.* at 10–11). After setting forth these principles, the Court reasoned as follows:

> In their renewed Motions for Summary Judgment, ... both Defendants now argue that the foregoing Reinstatement Agreement demonstrates, as a matter of law, that Local 801's alleged dilatory actions *did not* cause Hughes to lose his right to pursue a grievance. The Court finds this argument persua-

---

**2.** The facts surrounding Hughes' termination and the processing of his grievance are set forth more fully in the Court's July 16, 1999, Decision and Entry (Doc. # 64). For present purposes, those facts need not be repeated in detail herein.

**3.** As noted, *supra,* at footnote one, the Court sustained one of the summary judgment Motions, insofar as it related to Defendants other than Local 801.

sive. As set forth above, mere delay in the processing of a grievance, without more, does not constitute a breach of the duty of fair representation. *Ryan v. General Motors Corp.*, 929 F.2d 1105, 1109 (6th Cir.1989). In his amended Complaint, Hughes alleges prejudice, however, based upon Local 801's purported extinguishment of his right to pursue a grievance. In light of the recent settlement of Hughes' grievance, his allegation of prejudice necessarily fails as a matter of law. In short, a genuine issue of material fact no longer exists concerning Hughes' loss of the ability to grieve his termination. Local 801 has settled Hughes' grievance, and GM has not raised any "timeliness" objection.

Likewise, the settlement of Hughes' grievance demonstrates, as a matter of law, that his pursuit of relief through the existing contractual grievance process was not "futile." Given the substantial delay in the processing of Hughes' grievance, the Court previously reasoned that a trier of fact could find further utilization of grievance procedures to be futile. (Doc. # 50 at 18). The recent settlement of Hughes' grievance persuades the Court, however, that a genuine issue of material fact no longer exists regarding Hughes' futility claim. Indeed, the December 15, 1998, Reinstatement Agreement demonstrates, conclusively, that Hughes' pursuit of the grievance process was not futile.

(*Id.* at 12–13).

In opposition to the foregoing reasoning, Hughes previously argued that the Settlement Agreement was "a facade designed solely to deflect potential liability." (Doc. # 61 at 6). In particular, he stressed that GM and Local 801 had reached the Agreement only after this Court overruled their first Motions for Summary Judgment. He also alleged that the Defendants had allowed him inadequate time to return to Ohio from North Carolina. (*Id.* at 6–7). Finally, Hughes noted that the Reinstatement Agreement included certain unfavorable terms, including: (1) reinstatement on a "last chance" basis; (2) the inclusion of a penalty on his disciplinary record; and (3) the treatment of his absence as "personal leave," without any back-pay award. (*Id.* at 7).

In its July 16, 1999, Decision and Entry (Doc. # 64), the Court held that the foregoing arguments did not establish a genuine issue of material fact for trial. In reaching this conclusion, the Court reasoned:

... Hughes now alleges that the Defendants have entered into a sham Reinstatement Agreement solely to avoid liability in this litigation. If Hughes can prove this assertion, Local 801's assent to the terms of the foregoing Reinstatement Agreement may support a claim for breach of the duty of fair representation. As noted, *supra*, Hughes can establish such a claim by proving: (1) that Local 801's actions were arbitrary, discriminatory, or in bad faith; and (2) that Local 801's actions "tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach." *Dushaw v. Roadway Express, Inc.*, 66 F.3d 129, 132 (6th Cir. 1995); *see also Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir.1994) (recognizing that a plaintiff may establish a breach of duty of fair representation claim by showing, *inter alia*, "that the grievance process was 'seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct' "). Consequently, the fact that GM and Local 801 have settled the Plaintiff's grievance does not preclude

him from establishing a breach of the duty of fair representation, *if* he can show that Local 801's actions have undermined the *results* of the settlement. *See Hines v. Anchor Motor Freight,* 424 U.S. 554, 567–568, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Air Line Pilots Ass'n International v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).

The Court notes, however, that Hughes' allegations concerning the timing and terms of his settlement agreement are not contained in his amended Complaint. (Doc. # 17). The omission of these arguments is understandable, given that GM and Local 801 only recently settled Hughes' grievance. Nevertheless, the Court cannot address Hughes' assertions in the context of his present amended Complaint. As noted above, the existing Complaint alleges that Local 801's dilatory processing of Hughes' grievance caused him to lose his right to grieve his termination. For the reasons set forth above, however, the Court concludes that the Defendants are entitled to summary judgment on Hughes' amended Complaint. The recent Reinstatement Agreement demonstrates, as a matter of law, that Hughes did not lose his right to grieve his termination. Accordingly, the Court will sustain the Motions for Summary Judgment filed by Defendants Local 801 (Doc. # 54) and GM (Doc. # 56).

(*Id.* at 14–15).

Although the Court found GM and Local 801 entitled to summary judgment, it also granted Hughes leave to file a supplemental Complaint, properly raising his new arguments regarding the existence of a "sham" Settlement Agreement. (*Id.* at 15–16). Hughes filed such a Complaint (Doc. # 65) on July 30, 1999,[4] asserting a "hybrid 301" claim against GM and Local 801.[5] In particular, he alleges that GM fired him in violation of the CBA and that Local 801 breached its duty of fair representation by slowly processing his grievance and then entering into a "sham" Settlement Agreement, which includes the unfavorable terms set forth above, in order to avoid liability in the present case. Pending before the Court are renewed Motions for Summary Judgment filed by both Local 801 (Doc. # 72) and GM (Doc. # 73).

### I. *Summary Judgment Standard*

The Court will first set forth the relative burdens of the parties once a motion for

---

**4.** Although Hughes' most recent Complaint is styled as a "Second Amended Complaint," it is actually a supplemental Complaint, and the Court will refer to it as such herein.

**5.** In *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court explained the nature of "hybrid § 301" claims as follows:

Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301 [of the Labor Management Relations Act, 29 U.S.C. § 185], since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. Yet the two claims are inextricably interdependent. To prevail against either the company or the Union, ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.

*Id.* at 164–165, 103 S.Ct. 2281 (citations, internal quotation marks, and footnote omitted); *see also Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Winston v. General Drivers, Warehousemen & Helpers, Local No. 89,* 93 F.3d 251, 254 (6th Cir.1996).

summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by deter-

mining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

II. *Analysis of Pending Motions for Summary Judgment Filed by Local 801 (Doc. # 72) and General Motors (Doc. # 73)*

Hughes' cause of action against GM and Local 801 arises under Section 301 of the Taft Hartley Act of 1947, 29 U.S.C. § 185, which makes contracts entered into between unions and private employers enforceable in the federal courts. In his supplemental Complaint, Hughes alleges that GM terminated him in violation of the terms of the CBA and that Local 801 approved a "sham" Settlement Agreement merely to avoid liability for its delay in the processing of his grievance. (Doc. # 65). In order to prevail on his "hybrid 301" claim, Hughes must prove both of the foregoing allegations (i.e., that GM breached the CBA and that Local 801 breached its duty of fair representation). *White v. Anchor Motor Freight,* 899 F.2d 555, 559–560 (6th Cir.1990).

The pending Motions for Summary Judgment, however, do not address Hughes' contention that his discharge violated the terms of the CBA. Rather, the two Motions address Local 801's alleged breach of its duty of fair representation. In particular, the Defendants contend that Hughes cannot establish a breach of the duty of fair representation because the Settlement Agreement approved by GM and Local 801 is not a "sham," as a matter of law.[6]

Upon review, the Court agrees that GM and Local 801 are entitled to summary judgment on the claim raised in Hughes' supplemental Complaint. In support of their respective Motions, GM and Local 801 both rely largely upon affidavits from Harry C. Bogan, who is a member of Local 801 and a staff representative for Hughes' International Union. (*See* Bogan affidavits, attached to Doc. # 72). Bogan is the individual who negotiated the Settlement

---

**6.** If Hughes cannot demonstrate a breach of the duty of fair representation, then the issue of whether GM discharged him in violation of the CBA will be immaterial. As noted above, absent a breach of Local 801's duty of fair representation, Hughes cannot prevail on his hybrid 301 claim, regardless of whether GM violated the CBA. Consequently, both Defendants have focused solely on the alleged breach of the duty of fair representation by Local 801.

Agreement on behalf of Hughes. In one of his affidavits, Bogan explains both the process of settling the grievance and his rationale for doing so, stating, in relevant part, as follows:

2) As an International Staff Representative for the IUE I have handled thousands of cases at the Umpire level of the grievance procedure.[7] When handling these cases, I have had to determine whether to settle the case, withdraw the case, or arbitrate the case.

3) In determining whether to settle, withdraw, or arbitrate a case which has been appealed to the Umpire level, I have to exercise my best judgment based on the facts of the case and how likely I feel a case is to be successful at arbitration.

4) Union resources are limited, and the Union does not take all cases which reach the Umpire level to arbitration. In fact, most cases between General Motors ... and IUE which reach the Umpire level are settled.

5) I agreed to the settlement of Randy Hughes' grievance....

6) I received Mr. Hughes' grievance in the ordinary course of business between the Union and the Company. When grievances are brought to me, they are brought in a batch, by the shop chairman. The shop chairman waits to bring grievances to the Umpire level until a number of grievances have been gathered together. When a batch of grievances are [sic] brought in, they are then scheduled for arbitration. When the arbitration occurs depends upon the availability of the Umpire.

7) At the time I received Mr. Hughes' grievance, I believe I received a total of about 7 to 10 grievances that were being appealed to the Umpire level.

8) When a grievance is appealed to me, I investigate to determine the validity of the grievance, how likely the grievance is to be successful if arbitrated.

9) Before agreeing to the settlement of Mr. Hughes' grievance, I conducted an investigation of the grievance, just as I do for any grievance.

10) When investigating Mr. Hughes' grievance, I talked with the clerk Mr. Hughes claimed to have spoken with.... I tried to talk with Mr. Hughes. However, the phone number I was provided from the plant was disconnected.

11) I agreed to settle that grievance because I did not believe Mr. Hughes' grievance was one which I could win at arbitration.

12) I believed that the case was clear under the contract, because the provision at issue ... indicated that when leave ends, the worker must return to work within 3 business days. Because Mr. Hughes did not return to work within 3 business days of his leave ending, I felt an arbitrator would rule against him.

13) I also investigated Mr. Hughes' claim regarding a conversation with a clerk at GM who he claimed told him to report to work at a later time. The clerk denied having that conversation with Mr. Hughes. I also did not find Mr. Hughes' claim to be believable, because a clerk would not say what Mr. Hughes claimed she said. Furthermore, there was no documentation to support Mr. Hughes' claim.

---

**7.** Bogan settled Hughes' grievance at the "Umpire" level.

14) Because based on my understanding of the contract and my investigation of the facts, I did not believe Mr. Hughes' grievance would be successful before an arbitrator, I believed my only options were to withdraw the grievance or work out a settlement with GM. I would not waste the Union's money arbitrating a case, such as Mr. Hughes['], which I felt the Union would be so certain to lose.

15) I believe that the settlement I worked out with GM was a very good settlement because it got Mr. Hughes his job back. Additionally, because the time Mr. Hughes was not working was treated as a "personal leave," Mr. Hughes kept his seniority rights, which would have provided Mr. Hughes benefits for any issue determined by seniority, such as vacation time, wages and benefits.

16) In my experience resolving discharge grievances, the Union will accept a "last chance" settlement in order to get a worker his job back. Furthermore, in most cases, the company will not make a settlement agreement without what I refer to as the "boilerplate" language. That is, the language regarding drug/alcohol screening, a discharge if there is a positive drug/alcohol test, and the balance and thirty day penalty provision. If the company and the Union settle a grievance resulting from a discharge, such provisions are common. A case as weak as Mr. Hughes['] would not be one where I could get the company to leave out the boilerplate language.

17) It is very rare for a worker to receive back pay at the Umpire level. The Company will only agree to back pay for a very strong case, and most such cases are settled before they reach the Umpire level. For a grievance as weak as Mr. Hughes['], it would not be possible to get back pay.

18) Mr. Hughes was given until January 4, 1999[,] to return to work because of the holiday and plant shutdown. January 4, 1999[,] was when the plant was returning from the shutdown. Normally, when a grievance over a discharge is settled, the worker is given 7 to 10 days to report to work.

19) Mr. Hughes never contacted me to inform me that he would need more time to return to work. Had he done so, I would have tried to get the company to agree to provide a reasonable additional time.

20) I settled Mr. Hughes['] grievance in the ordinary course of business between the Union and the company. Nobody told me to settle this case to avoid liability in litigation. Nobody told me to treat this case differently than any other case. I treated this case the same as any other grievance.

21) In determining whether to settle Mr. Hughes' grievance, I exercised my best judgment and determined that the case should be settled on the terms agreed to in the settlement agreement based on the contract, the facts of the case, and the fact that I did not feel the case would be successful at arbitration. My judgment based on the merits of the case was the sole basis of my agreement to the settlement agreement.

(Bogan affidavit of Sept. 5, 2000, attached to Doc. # 72).

In light of the foregoing *uncontroverted* averments,[8] the Court concludes that the Settlement Agreement negotiated by Bogan on behalf of Hughes is not a "sham," as a matter of law. Bogan's affidavit reflects that he exercised his "best judgment" in settling Hughes' grievance. Bogan thought that Hughes had a weak claim, and he believed that Hughes would lose in arbitration. Notably, the Settlement Agreement negotiated by Bogan resulted in GM offering to reinstate Hughes with full seniority rights. According to Bogan, the other terms were standard, and he thought Hughes could do no better, given the facts revealed through his investigation.

In its July 16, 1999, Decision and Entry, the Court articulated the legal standards governing Hughes' claim that Local 801 breached its duty of fair representation by entering into a sham Settlement Agreement:

> ... Hughes can establish such a claim by proving: (1) that Local 801's actions were arbitrary, discriminatory, or in bad faith; and (2) that Local 801's actions "tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach." ... Consequently, the fact that GM and Local 801 have settled the Plaintiff's grievance does not preclude him from establishing a breach of the duty of fair representation, *if* he can show that Local 801's actions have undermined the

*results* of the settlement. *See Hines v. Anchor Motor Freight,* 424 U.S. 554, 567–568, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Air Line Pilots Ass'n International v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). (Doc. # 64 at 14–15).

In his Memorandum in opposition to summary judgment, Hughes cites no evidence to suggest that Bogan acted arbitrarily, discriminatorily or in bad faith when deciding to settle his grievance. Hughes also cites no evidence to suggest that the results of his grievance have been undermined in any way. Instead, Hughes first argues that Union representative James Marlow failed to process his grievance expeditiously before Bogan negotiated the Settlement Agreement. In other words, he challenges the grievance processing *procedure,* as opposed to the *terms* of the Settlement Agreement. Indeed, he suggests that the delay in processing his grievance demonstrates that it "would have been" futile for him "to have relied on the grievance procedure." (Doc. # 76 at 7). In its July 16, 1999, Decision and Entry, however, the Court *entered summary judgment in favor of GM and Local 801* with respect to Hughes' claims (1) that he suffered prejudice as a result of the slow processing of his grievance and (2) that pursuit of the grievance process would be futile.[9] (Doc. # 64 at 13).

As a result of the Court's July 16, 1999, Decision and Entry, the only remaining

---

**8.** In his Memorandum opposing summary judgment, Hughes cites no evidence to controvert any of Bogan's assertions. (*See* Doc. # 76).

**9.** In its July 19, 1999, ruling, the Court reasoned as follows:

> ... [M]ere delay in the processing of a grievance, without more, does not constitute a breach of the duty of fair representation. *Ryan v. General Motors Corp.,* 929 F.2d 1105, 1109 (6th Cir.1989). In his amended Complaint, Hughes alleges prejudice, however,

based upon Local 801's purported extinguishment of his right to pursue a grievance. In light of the recent settlement of Hughes' grievance, his allegation of prejudice necessarily fails as a matter of law. In short, a genuine issue of material fact no longer exists concerning Hughes' loss of the ability to grieve his termination. Local 801 has settled Hughes' grievance, and GM has not raised any "timeliness" objection.

Likewise, the settlement of Hughes' grievance demonstrates, as a matter of law, that

issue is whether Hughes can demonstrate that the Settlement Agreement is a "sham," based upon the terms of that agreement and the timing of the Union's decision to settle his grievance. (Doc. # 64 at 15). With respect to the "timing" issue, Hughes notes that the Defendants resolved his grievance after this Court overruled their first summary judgment Motions. Even if such timing is "suspicious," as Hughes alleges, the terms of the Settlement Agreement do not in any way suggest that Local 801 breached its duty of fair representation by electing to settle the grievance.[10]

In his Memorandum, Hughes contends that the Settlement Agreement is a sham, because the Defendants either knew or should have known that he could not return to Ohio from North Carolina in 12 days. (Doc. # 76 at 6). Notably, however, he does not controvert Bogan's averment that he never requested any additional time to move. Hughes also cites no evidence to suggest that other reinstated GM workers ever received more than 12 days to return to work. Consequently, Hughes has not raised a genuine issue of material fact with respect to whether the Settlement Agreement is a sham, based upon

the time that he was given to return from North Carolina.

Hughes also contends that the Settlement Agreement is a sham because it reinstated him on a "last chance" basis, assessed a "balance and 30 day penalty" on his disciplinary record, and treated his absence as personal leave. (*Id.*). He cites nothing, however, to controvert Bogan's averment that these terms are common in settlement agreements, particularly when a grievance is perceived as being relatively weak.[11] Although Hughes may be dissatisfied with the terms of the Settlement Agreement, the Court notes that "a deferential standard is employed as to a union's actions." *Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir.1992). In order to establish a breach of the duty of fair representation, Hughes must show that Local 801 acted arbitrarily, discriminatorily or in bad faith with respect to Bogan's decision to settle his grievance, thereby tainting the terms of the agreement. *Dushaw*, 66 F.3d at 132.

In light of Bogan's uncontroverted affidavit, Hughes has failed to create a genuine issue of material fact with respect to whether the settlement of his grievance was a "sham." Given that Bogan secured reinstatement for Hughes with full seniori-

---

his pursuit of relief through the existing contractual grievance process was not "futile." Given the substantial delay in the processing of Hughes' grievance, the Court previously reasoned that a trier of fact could find further utilization of grievance procedures to be futile. (Doc. # 50 at 18). The recent settlement of Hughes' grievance persuades the Court, however, that a genuine issue of material fact no longer exists regarding Hughes' futility claim. Indeed, the December 15, 1998, Reinstatement Agreement demonstrates, conclusively, that Hughes' pursuit of the grievance process was not futile. (Doc. # 64 at 13).

10. Although the timing of the Settlement Agreement may be suspect, Hughes cannot prevail on his present claim if the terms of

that Agreement are reasonable. In other words, notwithstanding the suspicious timing, Hughes cannot possibly show that Bogan made an arbitrary, discriminatory or bad faith decision to settle his grievance if the terms of the Settlement Agreement are objectively reasonable. The Court previously recognized this fact in its July 16, 1999, Decision and Entry, stressing Hughes' obligation to "show that Local 801's actions have undermined the *results* of the settlement." (Doc. # 64 at 15).

11. Parenthetically, the Court notes that Hughes also cites nothing to controvert either Bogan's assessment of the relative strength of his grievance or his rationale for electing to settle it.

ty, no reasonable trier of fact could conclude that the decision to settle his grievance on the terms set forth herein was arbitrary, discriminatory or in bad faith. Construing the evidence and all reasonable inferences in a light most favorable to Hughes, the Court finds no genuine issue of material fact for trial. Accordingly, the Defendants are entitled to summary judgment on the hybrid 301 claim raised in Hughes' supplemental Complaint (Doc. # 65).

### III. *Conclusion*

Based upon the reasoning and citation of authority set forth above, Defendant Local 801's Motion for Summary Judgment (Doc. # 72) is sustained. Defendant General Motors Corporation's Motion for Summary Judgment (Doc. # 73) is sustained.

Judgment will be entered in favor of the Defendants and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.